## PETER R. LANGDON

### *v.*

## THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Ottawa June 12, 1890.*

1. EXTRADITION—*practice in obtaining requisition—duplicates filed in office of Secretary of State.* It seems to be the custom in the office of the Secretary of State, to require duplicates of the papers necessary to secure a requisition for the return of a fugitive from justice. One draft of the petition, with its indorsed certificates, and one copy of the complaint, are kept on file in the Secretary's office, and the other draft and copy accompany the warrant which is delivered to the messenger.

2. CRIMINAL LAW—*forgery—of the indictment—innuendo as to person intended to be injured.* An indictment alleged that the defendant forged the name of a county judge to a certificate to the Governor of this State, for the purpose of procuring a requisition of the Governor upon the Governor of another State for the arrest of one Lou M. Hayward, and that such forgery was done with intent to deceive, prejudice, damage and defraud the said Lou M. Hayward. The name given in the certificate was Lou M. "Hayord:" *Held,* that the indictment was not bad for want of a proper innuendo that the "Hayord" named in the forged certificate was the same person as the "Hayward" named in the indictment.

3. SAME—*forgery by procuration.* A person who procures another to forge the name of one, is as guilty as if he had done it himself.

4. SAME—*evidence—proof of handwriting of the forger.* On the trial of one for forgery in signing the name of another, proof that the signature is not in the handwriting of the defendant is entitled to but little weight or reliance, for the reason that a forger seeks to disguise his own handwriting and to imitate that of the one whose name he forges.

5. SAME—*signature forged—variance in name—middle initial.* An indictment charged that the defendant forged the signature of Thomas Sawyer, a public officer, to a certain instrument of writing. The name to the instrument was Thomas W. Sawyer, while the evidence showed that the officer's name was Thomas S. Sawyer: *Held,* that there was no variance, the middle initial of a name being, in law, no part of the name.

6. CONFESSION—*as to a criminal charge—as evidence.* It has long been settled in our law, that while a free and voluntary confession of guilt is of the highest order of evidence, one extorted is never received. So where one, on his arrest for the forgery of the signature of a public officer to papers necessary to procure a requisition of the Governor for

the return of another charged with crime, was told he was arrested on that "requisition business," replied, "I have done the whole thing, and am willing to suffer the consequences," it was *held,* that such statement was admissible on the question of his guilt of the charge of forgery.

7. INSANITY—*as a defense—in criminal prosecution—presumption of sanity—evidence in rebuttal.* Every man is presumed to be sane until the contrary is shown. This may be rebutted by proof of his commitment in an insane asylum by the county judge, on due examination. And the discharge of a patient from such asylum may be regarded as evidence of his recovery, and the presumption of his insanity arising from his being in the asylum ought to cease.

8. SAME—*insanity established—presumption of its continuance.* After a person has been found insane by inquest properly held, the presumption of insanity may continue until it is rebutted by evidence of sanity. But a finding of an inquest is not the only proof of insanity which will give rise to the presumption of continuing unsoundness of mind. As a general rule, when insanity is proven as existing at a particular period, it will be presumed to continue until disproved. This rule, however, is subject to several qualifications.

9. One of these qualifications is, that the insanity shown to have existed prior to the commission of the act must be of a permanent type or of a continuing nature, or possessed of the characteristics of an habitual or confirmed disorder of the mind, or its peculiarities must have been exhibited for a long series of years. It is not sufficient that there be proof of a temporary or spasmodic mania.

10. Another qualification of the rule that the insanity of a party, when once established, will be presumed to continue until it is disproved, is, that too long a period of time must not be shown to have elapsed between the proved insanity and the act of crime charged.

11. SAME—*commitment to asylum—as affecting the presumption of continued insanity.* An instruction which assumes that the confinement of a defendant in the hospital for the insane at Anna, in 1878 or 1879, was such an establishment of insanity as to raise the presumption of its continuance, is properly refused when the evidence fails to show any proper finding, on inquest, of insanity, or insanity of a permanent character.

12. The insanity which authorizes the removal of a convict from the penitentiary to an asylum for the insane, is not necessarily an insanity of a permanent kind. It may be assumed, or pretended, or merely temporary. The removal is not based upon insanity that is determined by an inquest or legal adjudication, but because the attending physician or warden advises it.

13. SAME—*reasonable doubt.* A reasonable doubt of the sanity of one accused of crime, at the time of its commission, must acquit.

14.  SAME—*evidence—letter of prisoner to third person—mode of obtaining possession.*  A letter written by a prisoner while in jail, to a third person, was introduced in evidence by the prosecution, to show that the defendant was not insane, which was objected to.  The defense was allowed the privilege of showing that the letter was improperly obtained, but failed to establish such fact :  *Held,* that the court properly admitted the letter in evidence.

15.  SEARCHES—SEIZURES—*section 6 of the Bill of Rights—extent of the immunity of the citizen.*  Where a prosecuting officer obtains a search warrant in strict conformity to law, to search the office of a party in prison on a charge of forgery, and certain papers bearing on the question of the party's guilt are found, they may be used in evidence against him on his trial without violating the constitutional right of the party to be secure in his papers and effects against unreasonable search and seizure.

16.  Where a search warrant is issued upon probable cause, and is supported by affidavit, and particularly describes the place to be searched and the things to be seized, it will be such as is required by section 6 of the Bill of Rights.

17.  Section 2 of division 8 of the Criminal Code authorizes search warrants to be issued "to search and seize counterfeit or spurious coin, forged bank notes, and other forged instruments, or tools, machinery or materials prepared or provided for making either of them."  The words "other forged instruments," are broad enough to cover a forged certificate.

18.  The constitution does not prohibit all searches and seizures of a man's papers or other possessions, but such, only, as are "unreasonable," and the foundation of which is not previously supported by oath or affirmation.  Among the things that may be searched for and seized without violation of the Bill of Rights, are "books and papers of a public character, retained from their proper custody,  *  *  *  and forged bills or papers."  The search warrant may issue for a requisition of the Governor of the State for the apprehension and return of a fugitive, a paper of the Governor appointing one as agent of the State to bring back the fugitive, and a forged certificate of a county judge to the Governor in respect to such fugitive.

19.  Search and seizure may be made in special cases, when that which is the subject of the crime is supposed to be concealed, and the public or the complainant has an interest in it or in its destruction.

20.  INSTRUCTIONS—*drawing conclusions of fact from the evidence.*  An instruction is clearly erroneous which attempts to draw conclusions of fact from the evidence for the jury, instead of leaving it to them to draw their own conclusions.  It is error to say to the jury that the evidence admits only of a particular construction.

21. SAME—*assuming facts.* An instruction which assumes an important fact which has no evidence in its support, is properly refused, as being erroneous.

22. An instruction on behalf of one on trial for an alleged crime, which assumes that all the evidence of his guilt is purely circumstantial, where there is proof of confessions made by him, is properly refused. Proof of confession is not circumstantial evidence.

23. NEW TRIAL—*newly discovered evidence.* A new trial will not be granted on the ground of newly discovered evidence, when it appears that such evidence was known to the party and within his reach at the time of the trial, and is merely cumulative.

WRIT OF ERROR to the Circuit Court of Kankakee county; the Hon. N. J. PILLSBURY, Judge, presiding.

Messrs. HALEY & O'DONNELL, and Mr. STEPHEN R. MOORE, for the plaintiff in error:

Lou M. Hayward is the name of the party whose arrest on requisition was sought, while in the forged certificate it was Lou M. Hayord, and the name of the county judge was Thomas W. Sawyer, instead of his true name, Thomas Sawyer. Each count of the indictment was bad, for the want of proper innuendoes explaining and connecting the name of Hayord with the name Hayward, and showing that the name Hayord in the certificate was intended by the defendant to designate Lou M. Hayward, and also because there is neither innuendo nor averment that Thomas W. Sawyer is the Thomas Sawyer who was alleged to be the county judge.

When the words of a document are essential ingredients of the offense, as in forgery, etc., the document should be set out in words and figures. Wharton on Crim. Pl. and Pr. 167.

The omission of a word in an indictment for forgery is fatal. *United States* v. *Harriman,* 1 Baldw. 292.

The defendant's papers, obtained from his custody by an illegal search warrant while he was in jail, were erroneously admitted in evidence against him. Bill of Rights, sec. 3 ; *Wall* v. *State,* 5 W. Va. 532 ; *Boyd* v. *United States,* 116 U. S. 616.

Verbal confessions of guilt are to be received with great caution. 1 Greenleaf on Evidence, sec. 214.

As to the question of insanity, see Rev. Stat. chap. 38, div. 2, secs. 338, 339; *Chase* v. *People*, 40 Ill. 358; *Hopps* v. *People*, 31 id. 385; *Dunn* v. *People*, 109 id. 643; *Hoge* v. *People*, 117 id. 44; Rev. Stat. chap. 108, sec. 42.

After proof of general derangement, the burden of proof is changed to the prosecution, who must show, beyond a reasonable doubt, that the accused was sane at the time he committed the act. *Archy* v. *Stephens*, 8 Ind. 411; *Cunningham* v. *State*, 56 Miss. 269.

A man is presumed to be of sane mind till the contrary is shown. But if derangement or imbecility be proved or admitted at any particular period, it is presumed to continue till disproved. *Peaslee* v. *Robbins*, 3 Metc. 164; 1 Greenleaf on Evidence, sec. 42.

Mr. WILLIAM R. HUNTER, State's Attorney, for the People:

A communication made to the State's attorney, as such, is absolutely privileged. *Vogel* v. *Granz*, 110 U. S. 311; *Worthington* v. *Scribner*, 109 Mass. 487.

Though papers may be illegally taken from the possession of the party against whom they are offered, it is no valid objection to their admissibility if they are pertinent to the issue. The court will not take notice of how they were obtained. 1 Greenleaf on Evidence, (Redfield's ed.) sec. 254; *Gates* v. *People*, 14 Ill. 433.

In criminal trials, from motives of public policy, and upon the general principle of the convenience of public justice, the names of persons employed in the discovery of crime and collection of evidence are not permitted to be disclosed any further than is essential to a fair trial of the question of the guilt or innocence of the accused. 1 Greenleaf on Evidence, sec. 250.

The middle initial letter is no part of the name. *Miller* v. *People*, 39 Ill. 457; *Tucker* v. *People*, 122 id. 583.

Trivial errors in a criminal case will not reverse a conviction. *Lander* v. *People*, 104 Ill. 248; *Ritzman* v. *People*, 110 id. 362; *Wilson* v. *People*, 94 id. 299.

Newly discovered evidence must be clear, explicit, and, if cumulative, conclusive in its character, to require the court to grant a new trial for that cause. *Dyer* v. *People*, 84 Ill. 624.

An accessory before the fact is a principal, and may be indicted, tried and convicted as such. *Baxter* v. *People*, 3 Gilm. 368; *Brennan* v. *People*, 15 Ill. 511; *Dempsey* v. *People*, 47 id. 323; *Spies* v. *People*, 122 id. 1.

Forgery of public documents is made punishable by statute without intent. Roscoe on Crim. Ev. (7th ed.) 515, 560, 561.

It is not necessary to show that any person was actually defrauded. *Commonwealth* v. *Ladd*, 15 Mass. 526; *Rex* v. *Ward*, 2 Ld. Raym. 1461; *State* v. *Pierce*, 8 Iowa, 231.

The very act of forgery will be sufficient, of itself, to imply an intent to defraud. 2 Archbold's Crim. Pl. and Pr. 843; *State* v. *Woodard*, 20 Iowa, 553.

Evidence of an intent that the instrument forged shall be used as good, is conclusive evidence of an intent to defraud. In such case the law conclusively infers fraud. Moore on Crim. Law, sec. 567.

Possession of forged instruments in the county where indicted, is *prima facie* proof that the forgery was committed in that county. *Spencer* v. *Commonwealth*, 2 Leigh, 751.

When a party has acted in a public capacity, the law presumes he was duly appointed. On an indictment for the murder of a constable in the execution of his duty, it is sufficient that he was known to act as such, and his appointment need not be produced. 1 Wharton on Crim. Law, (7th ed.) sec. 615.

As to what constitutes criminal responsibility under the defense of insanity, see *Dunn* v. *People*, 109 Ill. 635; *Dacey* v. *People*, 116 id. 555.

Mr. JUSTICE MAGRUDER delivered the opinion of the Court:

This is an indictment, returned against the plaintiff in error by the grand jury of Kankakee County at the September term of the Circuit Court of that county, for the forgery of the signature of a public officer. Upon the trial in the court below the prisoner was found guilty, and sentenced to the penitentiary.

Section 113 of Division 1 of the criminal code of this State (Starr & C. Ann. Stat. page 786) provides that "every person who shall   *   *   *   forge or counterfeit the signature of any public officer   *   *   *   shall be imprisoned in the penitentiary not less than one nor more than twenty years."

Section 5278 of the U. S. Statutes at Large (Title 66 Extradition page 1027) requires that, whenever the executive of one State demands of the executive of another State the return of a fugitive from justice, there shall be produced "a copy of an indictment found, or an affidavit made before a magistrate of any State or Territory, charging the person demanded with having committed treason, felony or other crime," etc.

Section 9 of the Act of this State in regard to Fugitives from Justice (Chap. 60 of Rev. Stat. Starr & C. page 1209) provides, that "the manner of making application to the Governor of this State for a requisition for the return of a fugitive from justice shall be by petition," etc. After stating what shall be the contents of the petition, said section 9 closes as follows: "Such petition shall be verified by affidavit, and have endorsed thereon the certificate of the judge of the county court of the county in which the crime is alleged to have been committed, that the ends of justice require the return of such fugitive. Such petition shall be filed by the Governor in the office of the Secretary of State to remain of record in that office."

Plaintiff in error was a physician, residing in Kankakee, Kankakee County. On April 2, 1889, he made an affidavit or complaint before one Ripley, a justice of the peace in said county, charging that on March 20, 1889, one Lou M. Hay-

ward, being then a resident of said county, was entrusted as bailee with $200.00 in money, and jewelry worth $80.00, belonging to him; that, on March 21, 1889, in said county, she embezzled said money and jewelry and converted the same to her own use, and left the State of Illinois, and that he believes she obtained the said money and goods with the intent, at the time, of converting the same to her own use.

On the same day, with this complaint or a copy thereof in his possession, plaintiff in error went to Springfield with a view of obtaining a requisition upon the Governor of Arkansas for the return of said Hayward, it being supposed that she had fled to Arkansas. He obtained from an employe in the office of the Secretary of State at Springfield blank forms of the petition required by said section 9, with blank certificates thereon endorsed to be signed by the county Judge and the State's Attorney. Though the certificate of the State's Attorney is not required by the statute, it seems to be the custom to secure the same in certain cases where the facts warrant it. On the morning of Wednesday, April 3, 1889, plaintiff in error had returned from Springfield to Kankakee, and appeared before the grand jury, which was then in session, for the purpose of having Lou M. Hayward indicted. The grand jury, however, refused to find an indictment.

Plaintiff in error procured an attorney and notary by the name of Day to fill up the blank form of the petition, and he signed and swore to said petition before Day on April 3, 1889. With the petition and a certified copy of the complaint he applied to the State's Attorney to sign a certificate, stating that as State's Attorney he had examined the case, that the said Hayward was a fugitive from justice, and had, as he believed, taken refuge in Arkansas, that she fled from Illinois before an arrest could be made, and that he believed he had within his reach and could produce on the trial evidence necessary to secure her conviction. This certificate the State's Attorney declined to sign, and at the same time said to plaintiff in error:

"I don't believe it would do you any good to see the county·
judge because if I don't sign it, he will not." The plaintiff in
error then took the papers and left the office of the State's
Attorney.

The county judge of Kankakee County at this time was
Thomas S. Sawyer. It is not altogether clear from the evi-
dence whether he was applied to, to sign the certificate en-
dorsed on the petition, or not. But the proof is clear, and
uncontradicted by either side, that he never did sign such
certificate.

It seems to be the custom in the office of the Secretary of
State to require duplicates of the papers necessary to secure
the requisition of a fugitive. One draft of the petition with
its endorsed certificates, and one copy of the complaint afore-
said, are kept on file in the Secretary's office, and the other
draft and copy accompany the warrant which is delivered to
the messenger. Either on April 3, 1889, or at some time be-
tween that date and April 8, 1889, the plaintiff in error sent
by mail to the Secretary of State at Springfield two drafts of
the petition aforesaid with certificates endorsed thereon pur-
porting to be signed by the county judge of Kankakee County,
and two copies of the complaint before the justice.

The papers were submitted to the Governor of Illinois, and,
by endorsement upon the draft of the petition filed in the office
of the Secretary of State on April 8, 1889, the Governor di-
rected the Secretary to issue the requisition in accordance
with the prayer of the petition. Accordingly the Secretary
prepared the usual certificate of appointment of a messenger
and the warrant addressed to the Governor of Arkansas. The
said certificate of appointment authorizes and empowers the
plaintiff in error, P. R. Langdon, "as messenger and agent on
the part of the State to receive from the proper authorities of
the State of Arkansas Lou M. Hayward, who stands charged
by complaint with the crime of grand larceny as bailee, com-
mitted in the county of Kankakee in this State, and is now a

fugitive from justice, and convey her to this State to the Sheriff of said county where the offense was committed," etc. The warrant refers, in express terms, to "the annexed papers", being the complaint and petition with the endorsements thereon, and requires, "that said Lou M. Hayward be arrested and delivered to P. R. Langdon, who is hereby authorized and commissioned as the agent of this State to receive the said fugitive, and convey her to the State of Illinois there to be dealt with in accordance with the laws."

The certificate of the messenger's appointment and the warrant, which both bear date April 8, 1889, were signed by the Governor; the great seal of the State was affixed thereto; and such certificate and warrant, with "the annexed papers," were sent by mail by the Secretary of State to the plaintiff in error at Pine Bluff, Arkansas, and, being received there in his absence, were re-mailed to him at Kankakee, Illinois, and received by him at the latter place.

It appears from his own evidence that plaintiff in error was in Arkansas on the 4th and 5th days of April, 1889, but, failing to find said Hayward, returned to Illinois before the arrival of the documents from Springfield. No use seems to have been made of the requisition papers in Arkansas, nor is it shown that they were presented to the Governor of that State.

Upon the petition presented to the Governor of Illinois for a requisition was endorsed the following certificate: "I, Thomas W. Sawyer, County Judge of Kankakee County, State of Illinois, do hereby certify that the ends of justice require the return of Lou M. Hayord."

(signed) "Thomas W. Sawyer, County Judge."

The plaintiff in error is charged with having forged the signature of Judge Sawyer to this certificate. The County Judge swears that it is not his signature, and that he never signed his name to the document in question. The defense do not deny that the signature is a forgery.

Who committed the forgery? The defendant, Langdon, was arrested at Kankakee by the Sheriff of the county, O'Brien, on the evening of August 31, 1889, upon a warrant issued by a justice of the peace on the complaint of the State's Attorney and the County Judge, charging him with the crime of forgery and counterfeiting. O'Brien swears, that he read the warrant to the defendant; that the defendant "asked what it was for," and, upon being told "it was on that requisition business," replied: "I have done the whole thing and am willing to suffer the consequences." Durfee, a deputy clerk of the Circuit court, swears that he was present when the arrest was made and heard defendant say: "Gentlemen, I did it and I will have to take the consequences" or "words similar to that." Vaughn, a deputy sheriff, was also present at the time of the arrest, and swears that he heard defendant say: "I did it and am willing to suffer the consequences." Durfee also swears, that, on the evening of the arrest, he was requested by the defendant to call at the jail the next morning, which he did, and that, at a conversation then had, defendant made the same admission again, and said that it was done at Mr. Ripley's office, and that the papers were mailed from Kankakee to Springfield, and were to be mailed from there to Arkansas.

In *Miller et al.* v. *The People*, 39 Ill. 457, we said: "The rule has been long settled in our law that, while a free and voluntary confession of guilt is of the highest order of evidence, one extorted is never received." We see nothing in the testimony to show that the confession made to the three witnesses above named was not entirely free and voluntary. The defendant expressed himself as being sorely disappointed, that the grand jury did not indict the woman, Hayward, and the proof shows that he was very anxious to secure her return to the State. He was the only person, who is shown to have had any motive for forging the signature of the county judge. The papers were last seen in his possession before they were received at the office of the Secretary of State. Day swears that

he filled out the blanks and told defendant he must obtain the signatures of the State's Attorney and county judge, and that defendant took the papers away with him, and that he, Day, did not thereafter see them. Hunter, the State's Attorney, swears that defendant took away the papers upon his refusal to sign the certificate, and that he, Hunter, did not thereafter see the defendant for two weeks.

The theory of the State is that the defendant committed the forgery on April 3, 1889, in Kankakee, and mailed the papers on the evening of that day to Springfield, whence they were forwarded, with the warrant, etc., to Arkansas.

The defendant says that, when he was at Hunter's office, Hunter took the papers, which were in a large envelope, and went out of his office saying that he would see if the county judge would affix his name; that defendant remained in the office 10 or 15 minutes until Hunter's return; that Hunter came back and "said it could not be done"; that defendant then put the envelope with the papers in it in his pocket and went out of Hunter's office. In a part of this statement defendant says that it was in Day's office where he waited for 10 or 15 minutes, and that it was Day, who stepped out and returned, but he afterwards corrects himself and says that it was Hunter.

Defendant also swears, that on the evening of April 3, 1889, at 10:45 P. M. he left Kankakee with the papers in his possession, which he had not looked at since leaving Hunter's or Day's office, and went to Pine Bluff, Arkansas, where he arrived at 3 p. m. on April 4; that he found the woman had gone to some other place; that he went into a lawyer's office in Pine Bluff and handed to him the envelope with the papers in it; that the lawyer went into an adjoining room with the papers, saying "I will fix them for you," and upon returning handed them back with the remark: "Send them to Springfield, they are all right"; that he, defendant, did not examine the papers, but sent them to Springfield with directions to

return to him at Pine Bluff; that he staid in Pine Bluff a day and night, and then, going to Texarkana where he failed to find the party he was looking for, he returned to Kankakee.

Hunter swears that the first time he ever saw the certificate purporting to be signed by Sawyer was at Springfield in July, 1889, when he and Sawyer went to the office of the Secretary of State to examine the petition there on file.

If the lawyer at Pine Bluff committed the forgery, he must have done so at the instance of the defendant, for it is hardly to be supposed, that he would know the name of the county judge at Kankakee, Illinois, or would sign such name to a public document of his own motion and without being prompted to do so.

After a careful examination of the evidence, some of which is above set forth, we cannot say, that the jury were not authorized in finding that the name of the county judge was signed to the certificate in question by the plaintiff in error. A number of witnesses were produced, who swore that they were acquainted with the handwriting of plaintiff in error, and that the signature, "Thomas W. Sawyer," is not in his handwriting. But little reliance can be placed upon such testimony. The forger seeks to disguise his own handwriting and to imitate that of the man whose signature he forges. Moreover, if plaintiff in error procured some one else to sign the name of the county judge, his guilt is the same as though he did it himself.

It is claimed that the crime is not proven to have been committed in Kankakee County as charged in the indictment. There is testimony tending to show that the name was signed to the certificate at the office of Ripley, a justice of the peace, in the city of Kankakee in the county of Kankakee and State of Illinois. There is no direct evidence tending to show that the name was signed in Arkansas. What defendant says on that subject amounts to mere insinuation. It was for the jury to determine, and we cannot say that their verdict is against the weight of the evidence upon this subject.

It is said that there is a variance between the indictment and the proof, because the signature to the certificate, is Thomas W. Sawyer, whereas the evidence shows that the name of the county judge was Thomas S. Sawyer. The indictment charges that the accused "did forge and counterfeit the signature of Thomas Sawyer, then and there a public officer, to a certain written instrument," etc., setting out the certificate and the signature thereto in full, and "that the said Thomas Sawyer was then and there * * * sole judge of said county and of the county court thereof," etc. This was sufficient. The middle initial of a name is, in law, no part of the name. (*Miller et al. v. The People, supra; Tucker v. People*, 122 Ill. 583.)

The point is also made, that there is a want of proper innuendoes in the indictment showing that the "Lou M. Hayord" named in the certificate is the same person as Lou M. Hayward. The first, third and fourth counts set out the certificate *in hæc verba*, and aver that Langdon forged it with intent "to deceive, prejudice, damage and defraud the said Lou M. Hayward," etc. This was sufficient. A *nolle pros.* was entered as to the second count.

It is furthermore claimed, that the trial court erred in admitting in evidence the requisition papers, on the alleged ground that they were obtained from the possession of the prisoner by an illegal search and seizure.

As we understand the testimony, the forged certificate introduced upon the trial was the certificate upon the original petition filed with the Secretary of State. Such petition with its endorsements was obtained from the office of that official at Springfield, and was produced at the trial. But it would appear to be the fact, that there were also produced upon the trial the duplicate originals of such petition and certificate, which had accompanied the warrant sent to the defendant at Pine Bluff, and which had been obtained from the defendant's office in Kankakee under the circumstances hereinafter detailed.

O

On September 1, 1889, W. R. Hunter, the State's Attorney, made complaint in writing verified by affidavit before B. H. Nichols, a justice of the peace in Kankakee County, stating therein that Langdon on April 3, 1889, in said county, forged an official certificate of the county judge to a petition for a requisition upon the Governor of Arkansas for the arrest of Lou M. Hayward, setting forth therein the exact words of such certificate, and averring that the complainant verily believed that the said forged certificate was concealed in the office lately occupied by P. R. Langdon on the east side of East Avenue over the grocery store of J. C. Brink in the city of Kankakee in said county, and that the grounds of complainant's belief were : he was informed by the Sheriff that Langdon, who was then in jail under arrest for said forgery, told the Sheriff the certificate was in said office, and praying for the issue of a search warrant according to law.

A search warrant was at the same time issued by said justice to the Sheriff of said county, wherein, after setting forth the contents of the complaint made by Hunter, the Sheriff is commanded "to enter, in the day time, into the said office and there diligently search for the said forged certificate," and to bring the same, and the person in whose possession it is found, before said justice or some other justice, etc. The return on the warrant, dated September 2, 1889, shows that, on the day before, the Sheriff searched said office in the day time, and "there found the said forged certificate, which I here produce in court, the said office being then and there vacant and open and no person found therein." The docket of Nichols, the justice, recites that the certificate, having been brought to him as stated in the Sheriff's return, was, upon motion of the State's Attorney, turned over to the custody of said State's Attorney.

The affidavit for a search warrant, and the search warrant, and return thereon, and the docket of the justice, were all introduced in evidence and are in the record before us. They conform in every respect with the requirements of Division 8

of the criminal code of this State.   The Sheriff testifies that, when he went to the jail with the search warrant before making the search, the defendant told him where to go to find the papers.   As we understand it, the petition, with the forged certificate endorsed on it, was attached to the warrant, and such petition and warrant, together with the certificate of the messenger's appointment and a copy of the original complaint against Lou M. Hayward, were found together by the Sheriff, and were produced on the trial, and are set out in the record.

In the facts thus detailed, we cannot see that there was any violation of the constitutional right of the plaintiff in error to be secure in his papers and effects against unreasonable search and seizure.   The search warrant was such as is required by section 6 of the bill of rights.   It was not issued without probable cause; it was supported by affidavit; it particularly described the place to be searched and the things to be seized. (*Housh* v. *The People*, 75 Ill. 487).

The search and seizure shown by the proofs were not unreasonable.   Section 2 of Division 8 of our criminal code authorizes search warrants to be issued "to search for and seize counterfeit or spurious coin, forged bank notes *and other forged instruments,* or tools, machinery or materials prepared or provided for making either of them."   The words, "other forged instruments," are broad enough to cover the certificate forged by plaintiff in error.

In *Boyd* v. *United States,* 116 U. S. 616, the Supreme Court of the United States, speaking through Mr. Justice Bradley, said: "the laws which provide for the search and seizure of articles and things, *which it is unlawful for a person to have in his possession for the purpose of issue or disposition,* such as counterfeit coin, lottery tickets, implements of gambling, etc., are not within the category of unreasonable searches and seizures.   *Commonwealth* v. *Dana,* 2 Met. (Mass.) 329.   *Many other things* of this character might be enumerated."   In *Commonwealth* v. *Dana, supra,* the Supreme Court of Massachusetts,

speaking of the article upon searches and seizures in the bill of rights, says: "This article does not prohibit all searches and seizures of a man's person, his papers, and possessions; but such only as are "unreasonable", and the foundation of which is not previously supported by oath or affirmation. The legislature were not deprived of the power to authorize search warrants for probable causes supported by oath or affirmation, and for the punishment or suppression of any violation of law. The law, therefore, authorizing search warrants *in certain cases,* is, in no respect, inconsistent with the declaration of rights."

What are the "certain cases" in which search warrants may be issued? What are the "many other things," besides those above mentioned, for the seizure of which search warrants may be issued? They are enumerated by Cooley in his work on Constitutional Limitations, and among them he mentions "books and papers of a public character retained from their proper custody * * * and *forged bills or papers.*" (Cooley on Cons. Lim. 5th ed. top page 372, marg. page 306, note 1). Among them must certainly be included the documents taken from the plaintiff in error. They were not private papers. One of them was a warrant issued by the Governor of Illinois to the Governor of Arkansas, requiring the latter to cause the arrest of a fugitive; another was a paper appointing the plaintiff in error an agent of the State of Illinois to bring a supposed violator of its laws from the State of Arkansas; still another was the forged certificate of a public officer of this State, without which the warrant and certificate of appointment would never have been issued. The forged certificate was the power that had been used to set in motion the action of the chief executive of the State. The warrant based upon the forged certificate might yet be used to secure the return of the fugitive; it was, therefore, unlawful for plaintiff in error to have it in his possession, as it was in his power to make an unlawful "disposition" of it.

Search and seizure may be made in "special cases where
that which is the subject of the crime is supposed to be con-
cealed, and the public or the complainant has an interest in
it or in its destruction." (Cooley on Con. Lim. idem.) Here,.
the certificate, which was the subject of the crime of forgery,
was concealed in the prisoner's office, and the public had an
interest in its destruction that it might not be used wrongfully
to procure action by the executive of a sister State. For this.
reason, it was allowable to introduce it in evidence. (Idem.)
(See also, *Commonwealth* v. *Dana, supra.*) We are, therefore,
of the opinion that the trial court committed no error in ad-
mitting in evidence the papers taken from the prisoner's office
over his objection that they had been procured by an unrea-
sonable search and seizure.

But the main defense relied upon by the defendant on the
trial below was his alleged insanity at the time the crime was
committed. In order to understand the errors complained of
upon this branch of the case, it will be necessary to make a
brief summary of the evidence in relation to the mental con-
dition of the accused.

The defendant testified, that he was for nearly two years
in an insane Asylum at Anna in this State; that he was "dis-
charged on parole" by the physician in charge and allowed to
go to Chicago; that he went thence to Memphis, Tennessee,
where he remained a very short time, and returned to Illinois
and settled at Metropolis; that he was at Metropolis over two
years and a half; that then he came to Kankakee on Septem-
ber 22, 1881; that he went to Anna from the penitentiary at
Joliet; that he was not guilty of the offense for which he was
sent to Joliet; that he was transferred from the penitentiary
to the insane asylum because the warden and attending phy-
sician of the former charged him with being insane. One
Toler, a witness for the defense, stated he was an employe in
the asylum ten years theretofore, when the accused was there,
as an insane patient, under the name of Rose; that defendant

was there a little over a year; that he had no particular delusions; that he "paroled himself" and on meeting witness at Kankakee requested witness "not to give him away."

The defense introduced a number of other witnesses who testified to instances where the accused was greatly excited under special provocation; that, on one occasion in 1884, he made a political speech in Kankakee, and acted like a wild man; that he acted strangely sometimes, and was either "under the influence of liquor or a little bit off;" that there were times when he seemed to have delusions, "what I would call off;" that these periods would not last a great while; that at these times he was excited and bothered about something and out of his head somewhat, and his temper was not the same all the time, but changed; that he sometimes walked and talked at night in his room; that he seemed to be insane at times on politics. Such is substantially the purport of the testimony of the non-professional witnesses introduced by the defense, and the occurrences to which they refer took place in Kankakee during the period of eight years from 1881 to 1889.

The defense also examined two physicians as witnesses. One of them, Dr. Schubert, who graduated in medicine in 1888 and was also a pharmacist in Kankakee, testified that he had known the accused since 1881; that he had noticed eccentricities and peculiarities in his mental condition; that he was very nervous, and one of his peculiarities was his "emotional excitability;" that these conditions would not last very long and were only temporary; that, in the opinion of witness, he had "certain taints of insanity that is harmless;" that the drug store of witness had been putting up prescriptions for the accused ever since he had been in Kankakee. The other physician, Dr. Ellis, a resident of Kankakee for twenty two years, a graduate of the New York Medical College, testifies that he had observed the accused at times when he was satisfied that he was insane, that he was naturally a man of social habits; that, after he had taken one or two drinks of alcoholic

spirits and was then crossed in his conversation or opposed in his ideas, he would get exasperated and have one of his spells; that under such circumstances "his mind is completely alienated, in other words he is in a state of insanity *for some time;*" that, opposed in his ideas, "he then becomes unsound, unhinged, he is in a state of active mania and dementia *for the time being;*" that he has seen this condition caused by an argument when he would become exasperated and infuriated; that he had known one of these paroxysms to last three or four days, but could not tell whether he had been drinking during the interval or not; that, when he gets into these paroxysms of temper, he is combative and inclined to fight.

In rebuttal the State examined two physicians. One of them, Dr. Knott, a graduate of Rush Medical College in Chicago, a resident of Kankakee for thirty years and having an experience of many years as a practitioner of medicine and surgery, testifies, that he had known Dr. Langdon ever since the latter came to Kankakee, and had practiced with him and had been called in frequently in cases where he was physician; that he did not "see but what he was as sane as people generally are: he is a man that is very quick tempered, and when drinking a little he is rather excitable, but I did not see at the bed side but what his head was as clear as any one's." The other physician, Dr. Vanriper, a graduate in 1855 of the Ann Arbor Medical College in Michigan, a resident of Kankakee for more than twenty years and a practicing physician and surgeon for over thirty years, testifies, that he had known the accused six or seven years, and had been present with him in the treatment of patients, and had never seen him insane, but that he "has been eccentric and a little quick-tempered and excitable." One Smith, a druggist in Kankakee, testified for the State, that he had known Dr. Langdon for three years or over, had seen him and talked with him nearly every day, had compounded his prescriptions for him during the year then last past, and had never seen anything about them but what

26—133 ILL.

was all right; that he had never seen anything about the accused that "showed any insanity" in his opinion; that he thought "the doctor had a very quick temper, and might, under some circumstances be a dangerous man if he thought anybody was afraid of him." One Bratton testified for the State, that he had a conversation with the accused in the jail about a week after his arrest, and the accused then said that he had been in the penitentiary once, and "got out of it on the insanity dodge and could do it again," and that it "was an easy matter to get away from the asylum."

It was also proven by the State, upon the rebuttal, that, in the matter of procuring an indictment of the woman Hayward before the grand jury, the defendant's proceedings and conversation were as rational as those of any ordinary man, but that "he was a little bit angry at the result of the hearing."

It was fairly left to the jury to say, under the instructions of the court, whether or not the defendant was insane when the crime of forgery was committed.

It will be noted that neither the attending physician at the penitentiary, nor the warden, was placed upon the stand to testify to the mental condition of the plaintiff in error when he was removed to Anna. He himself simply says, that the physician and warden *charged* him with being insane. Toler, who was with him at Anna, expresses no opinion upon the question of his sanity or insanity while he was in the hospital. Therefore, in considering the views hereinafter expressed, it must be borne in mind that the bare fact of the defendant's transfer from the penitentiary to the insane hospital in 1878 or 1879 is the only evidence of the unsoundness of his mind when he was so transferred.

The ninth instruction given for the prosecution is claimed by the plaintiff in error to be erroneous. It is as follows:

"9. If you believe, from the evidence, beyond a reasonable doubt, that the defendant forged said documents, as charged in the indictment, you are instructed, that before you should

find the defendant not guilty on the ground of insanity, you should have a reasonable doubt, from the evidence, that at the time of doing the act charged, the defendant was not sound of mind, but afflicted with insanity, and that such affliction was the efficient cause of the act, and he would not have done the act as charged but for such affliction of the mind."

Without doubt, this instruction is awkwardly expressed. But it tells the jury in substance, that, if they entertain from the evidence a reasonable doubt as to the sanity of the accused at the time of committing the forgery, they will be authorized to find him not guilty. "A reasonable doubt of the sanity of the accused, on the long and well recognized principles of the common law, must acquit." Such is the settled doctrine of this court. (*Hopps* v. *People*, 31 Ill. 385; *Dunn* v. *The People*, 109 id. 635; *Dacey* v. *The People*, 116 id. 555.) The instruction, however, seems to convey the idea, that, before the jury can acquit the defendant on the ground of his insanity, they must entertain a reasonable doubt as to whether or not "such affliction was the efficient cause of the act," and as to whether or not he would "have done the act as charged but for such affliction of the mind." In this respect, the instruction is incorrect, but such defect in it was favorable to the accused and unfavorable to the prosecution. It was held in the *Hopps* case, that acquittal should take place where the jury find from the evidence that insanity was the efficient cause of the act, and that the accused would not have done the act but for his insanity. A jury might not be willing to find that insanity was really the cause of an act, and yet might be in doubt whether such act was caused by insanity or not. A prisoner is in much greater jeopardy when his fate depends upon a finding made, than where such fate is dependent upon a doubt entertained.

Notwithstanding the inaccuracy of the instruction it could not have misled the jury when read in connection with the instructions which were given. For instance, the third instruction given for the defendant contained this language: "If from

the evidence in this case the jury entertains a reasonable doubt as to the defendant, Langdon, being a sane person at the time of committing the alleged forgery,   *   *   *   the jury should give him the benefit of the doubt and acquit him." Again, the sixth instruction given for the defendant contained the following: "If he was insane at the time of the alleged offense being committed, there could be no criminal intent, and to raise a doubt in your mind of his sanity is to raise a doubt of criminal intent, and if you have a reasonable doubt that the act * * * was done with a criminal intent, then you must acquit the defendant."

Error is claimed to have been committed by the refusal of the eighth instruction asked for defendant, which is as follows:

"8. The court instructs you, for the defendant, that when it is established that the defendant is an insane person at a given time, and was confined in the Southern Hospital for the Insane, at Anna, then the law presumes that this condition of the mind continues, and the burden of proof is shifted upon the prosecution to prove, beyond a reasonable doubt, that he had recovered from his insanity, or that he was sane at the time of the alleged committing of the offense charged. Sound mind is presumed if the defendant is neither an idiot, lunatic nor affected with insanity; but if he is afflicted with insanity, then sound mind is wanting, and crime is not established, and it is your duty to acquit the defendant."

After a person has been found insane by inquest properly held, the presumption of insanity may continue until it is rebutted by evidence of sanity. In *Titcomb* v. *Vantyle,* 84 Ill. 371, we said: "The legal presumption is, that all persons of mature age are of sane memory. This presumption continues until inquest found; then, perhaps, the presumption may be regarded as reversed, until it is rebutted by evidence that sanity has returned. *Lilly* v. *Waggoner,* 27 Ill. 395." In the present case, there is no proof whatever that the defendant was adjudged to be insane in accordance with the provisions

of the Act in relation to the commitment and detention of lunatics. (Rev. Stat. chap. 85.)

We are not inclined, however, to hold, in view of the general · weight of authority, that, in criminal cases, the finding of an inquest is the only proof of insanity, which will give rise to the presumption of continuing unsoundness of mind. As a general rule, where insanity is proven as existing at a particular period, it will be presumed to continue until disproved. (1 Greenl. on Ev. sec. 42 ; 2 Bis. on Crim. Proc. sec. 674 ; 1 Wharton's Crim. Law, sec. 63.) This rule, however, is subject to several important qualifications.

One of these qualifications is that the insanity, shown to have existed prior to the commission of the act, must be of a permanent type, or of a continuing nature, or possessed of the characteristics of an habitual or confirmed disorder of the mind, or its peculiarities must have been exhibited for a long series of years. It is not sufficient that there be proof of a temporary or spasmodic mania. (*Hix* v. *Whittemore,* 4 Metc. 545 ; *State* v. *Lowe,* 93 Missouri, 547 ; *People* v. *Francis,* 38 Cal. 183.) The rule is thus concisely stated by Wharton : "When insanity of a permanent type is shown to have existed prior to the commission of an act, it will be inferred to have continued, unless the contrary be proved, down to the time of the act. It is otherwise, however, when the proof is of temporary or spasmodic mania or of *delirium tremens.*" (1 Whar. Crim. Law, sec. 63, *supra.*)

The eighth refused instruction is formally defective in not requiring the jury to find that the insanity and confinement therein specified were established *by the evidence.* But, in addition to this, the instruction assumes that the confinement of the defendant in the hospital at Anna in 1878 or 1879 was such an establishment of insanity as to raise the presumption that he continued to be insane until April, 1889. The assumption thus presented to the jury was not warranted by the facts disclosed in the testimony.

Section 42 of chapter 108 of our Revised Statutes provides, that, if any case of insanity shall occur in the penitentiary, such insane person shall at once be *removed* to the insane hospital, and if he recovers before the time of imprisonment expires, he shall be returned to the penitentiary. The insanity, which authorizes the removal of a convict from the penitentiary to an insane asylum, is not necessarily an insanity of a permanent kind. It may be assumed, or pretended, or merely temporary. The removal is not based upon insanity that is determined by an inquest or legal adjudication, but such removal takes place or seems to have taken place in the present instance, because the attending physician or warden advises it. The provision for the return of the convict from the asylum to the penitentiary indicates the expectation of a merely temporary derangement.

Every man is presumed to be sane until the contrary is shown. In *State* v. *Davis*, 27 S. C. 609, this presumption was held to be rebutted by proof that the defendant had been confined in an insane asylum, but there he had been committed to the asylum "by the judge of probate after the usual examination." Whether or not the transfer of a convict from the penitentiary to a lunatic asylum under our statute is such evidence of permanent insanity as to justify the presumption that the insanity continues to exist for years after the confinement in the asylum has ended, will depend upon the circumstances of each case. The fact of such transfer may be a circumstance to be considered in connection with other evidence, but it is not itself conclusive upon the subject. The discharge of a patient from a lunatic asylum may be regarded as evidence of his recovery. (*State* v. *Davis, supra.*) In the case of the removal of a convict to such an asylum, the superintendent neglects his duty if he discharges such convict as being restored to reason before the term of his imprisonment expires, instead of returning him to the warden of the penitentiary; but if he continues to be insane after his term has

expired, it would seem that his stay in the asylum should continue. His discharge creates a presumption in favor of his recovery.

In the present case, it does not appear whether defendant's term of imprisonment had expired or not when he left the asylum, but he states himself that he was discharged on parole by the physician in control of the hospital at Anna. In the same breath with the statement of his confinement he utters the statement of his discharge. If he was sufficiently recovered to be discharged, whether on parole or otherwise, it would seem that the presumption of his insanity arising from his being in the asylum ought to cease. If his term was yet unexpired, he ought to have been returned to the penitentiary.

But the defense in this case proved, that whatever evidences of insanity were exhibited by the accused during the eight years before April, 1889, consisted merely of temporary spells. There was no continuing or permanent insanity in his case. In connection with the testimony as to his excitability, counsel for the defense themselves produced the highest proofs of his sanity. They showed that he practiced medicine for eight years, and that he had a large practice, and in the conduct of it showed ability and intelligence. They placed him on the stand as a sane witness to sustain their theory that the forgery was committed in Arkansas and not in Illinois, and his testimony in relation to his own conduct in connection with the extradition papers is clear, shrewd and coherent.

Another qualification of the rule that the insanity of a party when once established will be presumed to continue until it is disproved, is that too long a period of time must not be shown to have elapsed between the proved insanity and the act of crime charged against the prisoner. Bishop thus states the rule: "this evidence, to be admitted, or at least to be very weighty, should not refer to a period too long before or after the time when the criminal act was done." (2 Bish. on Crim. Proc. sec. 674.) Here, the act referred to in the refused in-

struction, to-wit: the confinement at Anna, occurred more than ten years before the commission of the forgery, and was followed by at least eight years of successful and skillful practice by the accused in one of the learned professions. Proof of such practice during the period in question was furnished by the defense itself in connection with its proof of the alleged insanity, and much of it came from the same witnesses who testified to the defendant's occasional outbursts of passion. The presumption, if any, arising from the confinement at Anna was rebutted in great measure by the testimony on the part of the defense. The eighth instruction ignored the distinctions here pointed out and was therefore properly refused.

The fourth instruction asked by the defendant was also properly refused for two reasons. First, it assumes that all the evidence of his guilt was purely circumstantial, whereas the testimony as to the confessions made by him was direct, and not circumstantial, evidence. Second, the substance of the fourth refused instruction was embodied in the tenth instruction given for the defendant. By the latter instruction the jury were told that, if they could reconcile the facts in the case upon any reasonable theory consistent with the innocence of the defendant, it was their duty to do so and to find him not guilty.

The tenth of defendant's refused instructions was clearly erroneous as drawing conclusions from the evidence for the jury, instead of leaving it to them to draw their own conclusions. It is erroneous to say to the jury that the evidence admits only of a particular construction. It is their province to place their own construction upon the evidence.

The thirteenth instruction asked by the defendant was also erroneous, because it assumed that the defendant was "found to be unpopular in the community." We find no evidence in the record that the defendant was unpopular in the community. Counsel has not called our attention to any such evidence.

As a part of their rebutting testimony the prosecution introduced in evidence a letter, written by plaintiff in error after his arrest in this case and while he was in the jail at Kankakee, for the purpose of showing his sanity and the clearness of his intelligence. The letter was addressed to a party in Chicago and had reference to other matters not connected with the present prosecution. Its introduction was objected to by the defense on the ground that it had been obtained by the State in an illegal and improper manner. It is unnecessary to discuss the question whether or not the prosecution was obliged to reveal the source from which the letter had come into its possession, nor is it necessary to consider the question whether or not the manner of obtaining the letter would have any effect upon its admissibility as evidence, if it was pertinent to the issue. (1 Greenl. on Ev. sec. 250; *Vogel* v. *Granz*, 110 U. S. 311; 1 Greenl. on Ev. sec. 254 a; *Gates* v. *The People*, 14 Ill. 433). It is sufficient to say that the trial court permitted the defense to introduce evidence with a view of proving, if it could be proved, that the letter was illegally obtained by the State. The defense put upon the stand the defendant himself and also called as its own witnesses both the State's Attorney and the Sheriff, but failed to show that the possession of the letter was obtained in any illegal or improper manner. There was, therefore, no error in overruling the objection to its introduction on that ground.

It is also assigned as error that the court below overruled the motion for a new trial. This motion was based upon the affidavit of one of the prisoner's counsel wherein it was stated what the defense expected to prove upon the second trial. The additional evidence to be introduced at such second trial can hardly be regarded as newly discovered evidence, because it appears from the record before us, that the evidence in question was known to the defense and within its reach at the time of the first trial. But if the proposed proof, as referred to in counsel's affidavit, be regarded as newly discovered, it is

merely cumulative in its character, and a new trial will not be granted for the production of such evidence. *Knickerbocker Ins. Co.* v. *Gould et al.* 80 Ill. 388; Hayne on New Trial and Appeal, secs. 90, 92).

After a careful examination of the record, we are unable to discover any grounds for a reversal of this judgment.

The judgment of the Circuit Court is, accordingly, affirmed.

*Judgment affirmed.*