(No. 23944.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ANNA V. CHURCH, Plaintiff in Error.

*Opinion filed April 16, 1937.*

John F. Twomey, and Walter V. Dysert, for plaintiff in error.

Otto Kerner, Attorney General, Oliver D. Mann, State's Attorney, and A. B. Dennis, for the People.

Mr. Justice Farthing delivered the opinion of the court:

Anna V. Church was indicted by the grand jury of Vermilion county and charged with forging the endorsement of Ida Moody to a county warrant for $30, dated

June 15, 1926. The first count, which was *nolled* at the close of the People's case, charged that the endorsement was forged with intent to defraud Ida Moody, and the second count, with intent to defraud Vermilion county. A motion to quash the indictment was overruled. Mrs. Church was found guilty by a jury and sentenced to the Illinois State Reformatory for Women at Dwight for a term of from one to fourteen years. The case is here on writ of error.

The defendant (plaintiff in error here) contends that the indictment fails to set forth facts sufficient to constitute the crime of forgery, because the warrant set forth in the indictment was "payable solely from the county tax, when collected, and not otherwise," and there is no averment that it was so paid; also, that the warrant, being so payable, was not an unconditional promise to pay and the indictment did not charge a crime. *People* v. *Gould,* 347 Ill. 298, is relied upon in support of this latter contention, but it is not in point. A prosecution under section 107 of the Criminal Code, which punishes the passing of fictitious negotiable instruments, was there involved. We held the note, which was payable, "according to the tenor of said principal note," to be non-negotiable, and even though it were fictitious it was not within section 107. The defendant was not charged with uttering a fictitious negotiable instrument, but with the forgery of an indorsement to a warrant, under section 105 of the Criminal Code, (38 S. H. A. 277; State Bar Stat. 1935, chap. 38, par. 261, p. 1184;) and in order to come within this section the forged instrument need not be negotiable. The indictment is not subject to criticism for failure to allege that the warrant was, in fact, paid out of the county tax when collected. The crime of forgery is complete with the making of a false instrument, the subject of forgery, with intent to defraud, and it is immaterial whether any one was in fact defrauded. (*People* v. *Meyer,* 289 Ill. 184; *Anson* v.

*People,* 148 id. 494.) The motion to quash was properly overruled.

For many years the defendant was the matron at the Vermilion County Home. She and her husband, the superintendent, lived in quarters provided for them at the home. During several years of that time Ida Moody's husband, Lester Moody, was in charge of the farm operated in connection with the home. Ida Moody was employed at a dollar a day for part-time work as chambermaid in the county home. This prosecution followed an investigation made by the county auditor who was elected in 1932. He found a series of twenty-six county warrants all for $30 or $31 and payable to the order of Ida Moody. The first was dated December 9, 1925, and the others were issued at one month intervals up to and including December 1, 1927. All of them purported to bear the indorsements of Ida Moody and the defendant. Claims for services purporting to be sworn to by Ida Moody before the defendant as notary public were introduced, and they corresponded to the warrants which had been issued to pay them. Ida Moody denied having endorsed these warrants and having received their proceeds in full. The defendant insisted at the trial that the endorsements were made with the consent of Ida Moody, as part of a system approved by the county auditor and county board of supervisors to pay for occasional employment about the home. She claims that out of the proceeds of the warrants she paid Ida Moody a dollar a day for every day she worked, and the remainder was paid to other employees at the same rate. Ida Moody admitted that she was paid cash in full by the defendant. Mrs. Church says the county board appropriated a dollar a day for her to use in this manner, and for convenience in payment one warrant was drawn for each month. She endorsed Ida Moody's signature, and used the proceeds to pay extra help. The People deny that any such arrangement existed, and claim that the defendant forged Ida

Moody's endorsement to the warrant. Ida Moody testi-
fied that she worked at the county home on Saturday after-
noons. She was employed to clean the office and ladies'
waiting-rooms and rooms of the inmates. She also cooked
the supervisors' dinner twice a year. She denied that the
signatures on any of the warrants were hers, or that she
had authorized defendant to endorse them. She admitted
signing the claim dated December 1, 1925, for $30, but
denied getting the money on it. On cross-examination she
stated that she signed the claim at the request of the de-
fendant so that she could get her wages, and said that the
amount, thirty dollars, was not on the claim when she
signed it. The only one of the series of checks she saw
was that dated December 2, 1926. She did not complain
to the defendant about using her name, but after her em-
ployment at the home had ceased she complained to Mr.
Blaney, a member of the board of supervisors. The war-
rant dated December 2, 1926, was sent to her by the de-
fendant's husband while Mrs. Church was in Covington,
Indiana. On her return the defendant told Ida Moody
that she would have to have the check to pay the bills. She
did not ask Mrs. Moody to endorse it.

Ray Wait testified for the People that the office of the
county treasurer is in Vermilion county and that the war-
rant in question was paid by that officer.

Herbert J. Walter, a handwriting expert, testified for
the People. In his opinion the endorsements on the war-
rants were written by the defendant. He was to be paid
$350 for the work he had done in connection with this
case and others.

Lottie Taylor testified that Ida Moody worked at the
home on Friday and Saturday afternoons, and thought that
she helped with the washing on Monday. Lester Moody
and John O. Frame stated that she worked there on Satur-
day afternoons.

Grover Blaney, who was a member of the board of su-
pervisors from 1928 to 1932, testified for the defendant that

in 1928, Mrs. Moody complained to him about her name being used on warrants. She said she knew of a check being issued in her name, but had not received the money on it. It will be noted that this was after Mrs. Moody's employment at the county farm had ended.

Frank P. Meyer, who was chairman of the committee of the board of supervisors in charge of the county farm from 1925 to 1927, testified that Mrs. Church was supposed to hire help for a dollar a day, and one check was drawn each month to pay such extra employees. The committee understood that one check for thirty or thirty-one dollars would be drawn. At first the arrangement was only for the chambermaids, but it was later extended to include all incidental help about the home. On cross-examination he denied being on intimate terms with the defendant. He admitted that she had been in his store at about 5 o'clock on a Saturday after her indictment, but denied being at his store on an occasion when Mrs. Church was supposed to have entered it from the rear at about 6:30 in the evening.

May Southerland testified that Ida Moody worked at the home on Wednesday, Friday and Saturday afternoons.

The defendant testified that she endorsed the checks in order to pay the extra help and insisted that the endorsements were authorized by Ida Moody. She testified that the claim which Ida Moody admitted signing was completely filled out when Mrs. Moody signed it. She told Mrs. Moody that she would have to authorize the defendant to sign checks and vouchers in order to get the money to pay her and the other part-time employees, and Mrs. Moody consented. She was not certain whether or not she cashed the warrant in question at the county treasurer's office. She denied any intention to defraud or injure the county. On cross-examination the People laid a foundation for impeachment by asking if she had not signed an affidavit which was read by her attorney at a hearing before the board of supervisors on April 21, 1936, in which

she had stated, in substance, that she had never signed the names of any persons on the pay roll, but they had received the checks themselves and that she knew the "signatures to the checks were genuine." Counsel for the defendant objected to the State's attorney reading the affidavit from a newspaper, on the ground that the affidavit itself would be the best evidence. The State's attorney said that he had served notice on defendant's counsel to produce the affidavit in court. Counsel for the defendant replied he did not have the affidavit and the State's attorney was permitted to proceed with reading the affidavit from the newspaper. The defendant answered that she did not remember making the statement.

L. H. Griffith, county auditor from 1918 to 1932, testified that the system described before was used to pay some of the help at the county home, but he denied knowing whether Mrs. Moody had authorized the defendant to sign her name. Seventeen witnesses testified that the defendant's general reputation for honesty and integrity and for being a law-abiding citizen was good.

In rebuttal Harry Barnes was permitted to testify over the defendant's objection that it was not rebuttal and was immaterial, that he had seen the defendant enter Frank P. Meyer's place of business by way of a back alley at 6:30 o'clock on the evening of June 15, 1936. Three other witnesses testified that they had heard the affidavit of Mrs. Church read by her counsel at the meeting of the board of supervisors, and that in it she had said she had never signed the names of other persons on the county pay roll; that the employees had received the checks themselves; that she knew their signatures and that the signatures were genuine.

The exhibits which had been received in evidence were not read to the jury, and as the jury was about to retire to deliberate, the State's attorney asked that the exhibits be given to the jury. The defendant's counsel objected

on the ground that the warrant had not been read to the jury, and that its reading had not been waived. The court then ruled that the exhibits should not be taken to the jury room. While the particular warrant was not formally read to the jury, the amount of it was stated, the signature to it was discussed, and its date was mentioned. In view of the defendant's admission that she endorsed Ida Moody's name on the warrant we are unable to see wherein she was prejudiced. In *Cothran* v. *Ellis,* 125 Ill. 496, we held that it was not prejudicial error to neglect to read a promissory note to the jury, where its execution was not denied. The defendant relies on *Brown* v. *People,* 66 Ill. 344, where we said that if the exhibits in a forgery case were not read to the jury, there is no evidence to support the verdict. The case was reversed on other grounds, and what was said was not necessary to the decision. But it appears that the defendant in that case denied signing the instrument, and in such case the exhibits should be read and shown to the jury. The defendant also relies upon *People* v. *Clark,* 301 Ill. 428, where we reversed a conviction of larceny, because the judge sent standards of handwriting used for comparison to the jury room. They had not been read in evidence, and, moreover, the defendant's counsel was not permitted to read from and compare them, in his argument to the jury. We condemned the taking of the standards of comparison to the jury room, and also the action of the court in not permitting counsel for the defendant to discuss the question before the jurors. We also said that the constitutional provision that the accused shall have the right to meet the witnesses face to face means that all the evidence must be produced in the presence of the accused, and to permit the jury to take handwritings from the bar of the court and to read and compare them for the first time while they are attempting to arrive at a verdict, violates the constitutional provision and gives undue emphasis to such evidence. Here the exhibits were not taken to the jury room,

but were excluded on defendant's motion. This contention is overruled.

The defendant contends the court erred in admitting evidence of other forgeries. No objection was made to the introduction in evidence of the series of warrants and claims, and they were admissible to prove intent. *People* v. *Vammer*, 320 Ill. 287, 289; *Anson* v. *People, supra.*

The defendant contends it was error to require proof of good character after the date of the alleged offense and up to the date of the indictment. The defendant's counsel agreed to the admission of such evidence and she is in no position to complain of it here. The same is true of the error assigned with reference to remarks of the court when Harry Barnes was being examined. The court said, "Yes, I remember he asked the defendant if she didn't go into his store by some rear entrance at 6:30 one evening." The court was mistaken, since Frank P. Meyer was asked the question, instead of defendant, but the statement was not prejudicial and it passed unnoticed by counsel for the defendant.

Counsel for the defendant next argue that the remarks of the State's attorney during the trial, and in his argument to the jury, were prejudicial. Except in the instances hereinafter mentioned either no objection was made, or objections were sustained, to improper questions and remarks.

The defendant contends that it was error to read the contents of her affidavit from a newspaper. in laying the foundation for her impeachment, and that the notice served on her counsel to produce the affidavit was insufficient and defective. No objection to the sufficiency of the notice was made on the trial, and the defendant's counsel stated that he did not have the original of the affidavit. In such a case, secondary evidence of the contents of the affidavit is admissible. It was proper to receive the testimony of the witnesses who had heard the affidavit read to prove that de-

fendant had made prior inconsistent statements. *Young* v. *People,* 221 Ill. 51, 58.

It is next contended that the venue was not proved beyond a reasonable doubt. While the venue must be thus proved, (*People* v. *Gregor,* 359 Ill. 402; *People* v. *Strook,* 347 id. 460;) in a forgery case the proof must often be by circumstantial evidence. In *Bland* v. *People,* 3 Scam. 364, it was said it would be difficult ever to prove the venue of a forgery if the law did not warrant inferences from established facts, and that, in the absence of other proof, an attempt to pass a forged instrument in Sangamon county would justify an inference that the place of forgery was in that county. In *Langdon* v. *People,* 133 Ill. 382, the testimony tended, in some degree, to show that the crime was committed in Kankakee county, and we refused to say that the verdict was against the weight of the evidence on the question of venue. In *People* v. *McIntosh,* 242 Ill. 602, the defendant was charged with forging a promissory note. The proof showed that he had an office in the county where the prosecution was had, where he wrote notes and mortgages and received and receipted for his client's money, and the note bore the signature of a person residing in the county of the prosecution. We held the evidence sufficient to show that the note was forged in that county, even though it was delivered in another county. In *People* v. *Cotton,* 250 Ill. 338, we held that the venue was proved to have been in Peoria county. The proof showed that the chattel mortgage was made and acknowledged there, and defendant had begun a foreclosure proceeding in that county. In that case the defendant was charged with altering a chattel mortgage.

In the case at bar Ray Wait testified that the warrant had been paid by the county treasurer of Vermilion county, whose office is in that county. The defendant was not sure where she cashed the warrant, but supposed that she cashed it at the county treasurer's office. She was matron of the

county home, and testified that she used the money in the payment of wages of employees there. There is nothing to show, aside from reference to casual trips to Indiana, that the warrant might have been endorsed outside Vermilion county. The visits outside the State appear to have been pleasure trips, and do not even tend to prove that the warrant was endorsed outside the county. There are sufficient circumstances in evidence to establish, beyond a reasonable doubt, the venue as laid in Vermilion county.

However, the defendant correctly contends that it was error for the trial court to permit the witness Frank P. Meyer to be impeached on a collateral matter. He stated that he was not at his store when Mrs. Church was supposed to have entered it from the alley about 6:30 P. M. on June 15, 1936. On rebuttal Harry Barnes was permitted to testify over objection that he had seen Mrs. Church enter Meyer's store at that time. This testimony did not contradict anything said by Meyer and its evident purpose was to prejudice the jury against Mrs. Church and to discredit Meyer. The error was aggravated by the State's attorney's reference to the circumstance in his argument to the jury, where he referred to the witness Meyer as "Wiggling Frank Meyer," and said that the purpose of showing that the defendant and Meyer had been meeting together after business hours was that they were attempting to conceal something and defeat justice. Such testimony had no tendency to show any intention to defeat justice. The injection of this collateral issue into the case with the attending circumstances was prejudicial to the defendant.

The State's attorney, in his closing argument, said that the People had been placed at a disadvantage in not knowing, until the defendant began putting in her evidence, what her defense would be. He claimed he would have found evidence to rebut the defendant's testimony that she had paid the money to people who were dead at the time of the trial. These remarks were improper, because the defend-

ant was not bound to state in advance what defense the testimony of her witnesses would tend to prove.

Complaint is made of given instructions and of the refusal of instructions. The third instruction given at the instance of the People, reads:

"The court instructs the jury that in judging of the weight and importance to be given to the testimony of any witness or witnesses in the case, you should take into account their means of knowledge of the facts of which they speak, and you have a right to judge from your own common observation of the ability of persons to judge of given facts from given opportunities and you are not obliged to accept as true the testimony of any witness or witnesses, if in your opinion judging from such common observation, they are or may be mistaken concerning the facts of which they speak."

By this instruction the jurors were told that they might disregard the testimony of witnesses, whether corroborated or not, if, in the opinion of the jurors, in the light of their experience and common observation, such witness or witnesses might be mistaken. The People rely on what we said in *Brant* v. *Chicago and Alton Railroad Co.* 294 Ill. 606, 620, with reference to the seventh given instruction in that case, as a justification of this instruction. But in that instruction the reasons for disregarding a witness' testimony had to be based on the other facts and circumstances proved and the jury had to believe, taking such facts and circumstances into consideration, that the testimony was untrue. Here they were told that they might disregard a witness' testimony if it "may" be untrue, and they were not required to consider such testimony in the light of the other facts and circumstances proved in the case. This instruction should not have been given.

The fourth instruction given on behalf of the People was as follows:

"The court instructs the jury that one method of impeaching a witness is by showing he has made statements out of court different from his evidence on the trial of the case, and you are further instructed that if you believe from the evidence that any witness or witnesses have wilfully made such contradictory statements as to material matters in evidence out of court, you may totally disregard the evidence of such witness or witnesses except as to such facts as may be corroborated by good and credible evidence of facts and circumstances in evidence."

In passing on a similar instruction in *Beedle* v. *People,* 204 Ill. 197, we said that contradiction must go to the extent that the jury may believe that the impeached witness has wilfully sworn falsely upon a material matter, before he is impeached, in the sense that his testimony may be disregarded except there be corroboration. (*Howard* v. *McDonald,* 46 Ill. 123; *O'Brien* v. *Palmer,* 49 id. 72.) We also pointed out that conflicting evidence alone does not amount to conclusive impeachment and cited in support of this, *Baker* v. *Robinson,* 49 Ill. 299. The term "impeached" means more than that witnesses have contradicted each other. At page 201 we said: "Unless the jury believe that a witness has wilfully sworn falsely upon a material matter they are not authorized to disregard the testimony of a witness." In *People* v. *Pursley,* 302 Ill. 62, 76, a similar instruction was modified by the court and the jury was told that it had the right to take into consideration the contradictory statements proved at the trial, in determining the weight to be given testimony of a witness who made contradictory statements. We held the instruction good as modified but stated that, as requested, it was bad, and cited *Beedle* v. *People, supra.* The fourth instruction was bad and should not have been given.

By the fifth instruction given at the request of the People, all that the jury was required to arrive at, in order to warrant it in finding the defendant guilty, was "an abiding

conviction of the truth of the charge." The People contend that this instruction was substantially covered by instructions 1 and 13, given at the request of the defendant. The instruction has the vice of substituting "an abiding conviction" for proof beyond a reasonable doubt, and even though the words, "abiding conviction amounting to a moral certainty," are contained in the first instruction given at the request of the defendant, the jury could easily have been misled by this fifth instruction into believing that the proof need not be made of the truth of the charge beyond all reasonable doubt. This instruction should not have been given.

We have examined the twenty refused instructions which defendant asked the trial court to give and as to the refusal of which she complains. By the seventeen instructions which were given at her request, the jurors were fully instructed as to her theory of the case. The defendant suffered no prejudice by the refusal of these twenty instructions.

It is contended that the evidence did not prove the defendant guilty beyond a reasonable doubt. We express no opinion on that question. We have recited the testimony at considerable length, but not in its entirety, in order to demonstrate that the proof of defendant's guilt was not so clear and convincing that the jury could not reasonably have returned a different verdict. It was highly important that the instructions given the jury should have been accurate and that the record should have been free from prejudicial error. *People* v. *Anderson*, 337 Ill. 310, 328; *People* v. *Hamilton*, 336 id. 294; *People* v. *Schuele*, 326 id. 366.

For the errors indicated the judgment of the circuit court of Vermilion county is reversed, and the cause is remanded to that court for a new trial.

*Reversed and remanded.*