BATES B. BURNETT *et al.* v. STATE.

No. A-1900.   Opinion Filed February 15, 1913.

(129 Pac. 1110.)

1. **COURTS—Criminal Court of Appeals—Jurisdiction—Proceedings for Contempt.** Under the Constitution (art. 7, sec. 2 [sec. 187, Williams']) and the statute (sections 1916 and 1917, Comp. Laws 1909), the Criminal Court of Appeals has exclusive appellate jurisdiction in criminal cases; and a proceeding and judgment for criminal contempt is reviewable on appeal to this court.

2. **CONTEMPT — Nature and Elements — "Criminal Contempts."** "Criminal contempts" are all those acts or conduct in disrespect of the court or its process, or which obstruct the due administration of justice, or tend to bring the court into disrepute.

3. **CONTEMPT—Proceedings to Punish—Power of Court.** The power to punish contempts is inherent in all courts of justice, and is expressly conferred upon them by the Constitution. Section 25, Bill of Rights. The exercise of this power has a twofold aspect, namely: First, the proper punishment of the guilty party for his disrespect to the court, or its order; and second, to compel his performance of some act or duty required of him by the court, which he refuses to perform.

4. **CONTEMPT—Proceedings to Present Evidence—Answer of Defendant.** In proceedings for contempt for disobedience to an order of court, the sworn answer of the party charged with contempt is evidence to purge him thereof; but it is not conclusive. It may be contradicted and supported by other evidence, and

the question whether or not the party charged has purged himself of the contempt is for the determination of the court, upon the consideration of all the evidence adduced for and against him; and if, upon such hearing, the court is satisfied that it is within the power of the contemner to comply with its order, the court should enforce the order by appropriate punishment.

5.    **CONTEMPT—Concealment of Subject-Matter of Action—''Criminal Contempt.''** A party to a suit, who willfully destroys, removes, conceals, or disposes of its subject-matter pending the proceeding, with intent to withdraw it from the jurisdiction of the court, and to render futile any order or decree concerning it, unavoidably defies the power and offends the dignity of the court, and thereby renders himself liable to punishment for ''criminal contempt.''

6.    **BANKS AND BANKING—Depositors' Guaranty—Insolvency of Bank—Record.** Under the act ''creating a state banking board, establishing a depositors' guaranty fund to insure depositors against loss when the bank becomes insolvent,'' etc., all of the books, records, and papers of the failed or insolvent bank taken over by the Bank Commissioner are public records, and become the property of the state.

7.    **WITNESSES — Privilege — Self-Crimination—Production of Records.** The officers of an insolvent state bank cannot disobey, on the ground of the constitutional protection against self-crimination, the order to produce and deliver the books, records, and papers of such bank to the State Bank Commissioner.

8.    **SAME.** The privilege against self-crimination afforded by section 21 of the Bill of Rights, ''that no person shall be compelled to give evidence which will tend to incriminate him, except as in this Constitution specifically provided,'' does not protect the officers of an insolvent state bank in resisting the compulsory production of its books, records, and papers because such documents may tend to incriminate them. And such officers may be compelled, in a judicial proceeding, to produce the books, records, and papers of such bank for inspection, even though to do so would tend to incriminate them.

9.    **CONTEMPT—Nature and Elements—''Civil Contempt.''** ''Civil contempts'' are those quasi contempts which consist in failing to do something which the contemner is ordered by the court to do for the benefit or advantage of another party to the proceedings.

(Syllabus by the Court.)

*Error from District Court, Creek County;*
*A. H. Huston, Assigned Judge.*

Bates B. Burnett and Birch C. Burnett were convicted of criminal contempt, and bring error. Affirmed, and order allowing bail as supersedeas revoked.

On the 7th day of October, 1912, an action was commenced in the district court of Creek county entitled "The State of Oklahoma, on relation of Chas. West, Attorney General, and J. D. Lankford, Bank Commissioner of the State of Oklahoma, Plaintiffs, v. Farmers' & Merchants' Bank of Sapulpa, a Banking Corporation, Bates B. Burnett, Birch C. Burnett, A. P. Crawford, S. C. Nigh, Thomas Wills, Charles W. Willis, the Big Pond Oil Company, the Boggy Oil Company, the Brown Real Estate Company, the Creek County Investment Company, Elbert Oil & Gas Company, the Sapulpa Interurban Railway Company, and Dannie Ross Burnett, Defendants."

The petition, among other things, alleges that the Farmers' & Merchants' Bank of Sapulpa, prior to September 9, 1912, was conducting a general banking business at Sapulpa as a state bank, on which said date said bank was taken over by the State Bank Commissioner; that the defendants Bates B. Burnett and Birch C. Burnett are stockholders of said bank.

Listed among the assets of said bank, among bills and notes, as alleged in the petition, are the following items:

| | |
|---|---|
| Big Pond Oil & Gas Co. | $ 10,000.00 |
| Brown Real Estate Co. | 29,753.75 |
| Creek County Investment Co. | 40,986.00 |
| Elbert Oil & Gas Co. | 9,250.00 |
| Sapulpa Interurban Ry. | 107,402.56 |
| Wade S. Stanfield | 3,815.82 |

Paragraph 3 of said petition is as follows:

"(3) That the defendants the Big Pond Oil Company, the Boggy Oil Company, the Brown Real Estate Company, the Creek County Investment Company, and the Elbert Oil & Gas Company are oil and gas and real estate corporations controlled and operated, in whole or in part, by the officers, directors, and stockholders of said Farmers' & Merchants' Bank, and have been financed, in whole or in part, from the funds and assets of said Farmers' & Merchants' Bank; and at the close of business on September 9, 1912, there was listed among the assets of said Farmers' & Merchants' Bank notes and bills aggregating $90,989, given by said companies, which are now held by the Bank Commissioner of the state of Oklahoma as the property of the state of Oklahoma, for the use and benefit of the bank guaranty fund of said state. That said bills and notes represent funds of the said Farmers' & Merchants' Bank which were advanced to said

companies in violation of law, and with the intent that the stockholders of said bank would profit personally, to the injury of the bank."

Paragraphs 6 and 7 are as follows:

"(6) That the property, assets, and business of the defendants the Big Pond Oil Company, the Boggy Oil Company, the Brown Real Estate Company, the Creek County Investment Company, the Sapulpa Interurban Railway Company, and Elbert Oil & Gas Company, which are in fact the property and assets of the Farmers' & Merchants' Bank, are being mismanaged and mishandled by the persons in control of same, and are in imminent danger of being entirely lost, and will be dissipated, unless prevented by the appointment of a receiver for all of said defendant corporations by this court in this action, to take charge of all the property and assets of said defendants, and to hold and manage same under the orders and direction of this court.

"(7) That the books of said Farmers' & Merchants' Bank, including the daily statement of resources and liabilities from February, 1908, to September 3, 1912, all remittance records for the years 1910, 1911, and 1912, journal of daily business in detail from 1910 to September 3, 1912, note register, and the personal accounts in the individual ledger of B. C. Burnett, B. B. Burnett, and the companies in which they are interested, have all been taken from the building occupied by said bank, and, although demand has been made on the officers, directors, and stockholders of said bank that they return said books to the Bank Commissioner, they have failed and refused, and still fail and refuse, so to do. That it is believed by relator that said books are now in the custody and under the control of the persons acting as officers and directors of said Farmers' & Merchants' Bank when same was taken over by the Bank Commissioner on September 9, 1912, and are being secreted in order to hinder and embarrass the state in administering the affairs of said Farmers' & Merchants' Bank."

The prayer of the petition is that the court appoint the Bank Commissioner of the state of Oklahoma as receiver for said defendants the Farmers' & Merchants' Bank and the corporations named, and then prays for judgment against certain stockholders for an amount equal to the par value of the shares of stock held by each, and that the court order and direct that the officers and directors of said Farmers' & Merchants' Bank turn over to the State Bank Commissioner all books, records, and papers pertaining to the business and affairs of said Farmers' & Merchants'

Bank, and that the plaintiff have such other and further relief in the premises as may be deemed proper.

The record shows that on the 11th day of October, in said case, in open court, the following order was made:

"Order to Produce Books, etc.

"The above cause coming on to be heard upon the application of the plaintiff for the appointment of a receiver for the defendant the Farmers' & Merchants' Bank, and for an order directing that the officers, directors, and employees of the defendant the Farmers' & Merchants' Bank, at the time same was taken over by the Bank Commissioner, turn over and deliver to the Bank Commissioner of the state of Oklahoma all books, records, and papers belonging to said bank, and the plaintiff being represented by W. C. Reeves, Assistant Attorney General of the state of Oklahoma, and the defendants being represented by Messrs. Rutherford and Lawrence, their attorneys, and the court being fully advised in the premises:

"It is ordered and adjudged that the application for a receiver for said Farmers' & Merchants' Bank be denied, to which order and judgment the plaintiff excepts.

"It is further ordered and adjudged that the petition and application herein shall be treated by the court as in the nature of a bill of discovery, for the purpose of securing the books and property which should be delivered over to the Bank Commissioner by the officers, directors, and employees of said Farmers' & Merchants' Bank as the books and property of said bank at the time said bank was taken over by the Bank Commissioner of said state of Oklahoma.

"It is further ordered and adjudged that the officers, directors, and employees of the Farmers' & Merchants' Bank of Sapulpa produce and deliver to the Bank Commissioner of the state of Oklahoma all property, books, and papers of said Farmers' & Merchants' Bank, and pertaining to the business and affairs of said Farmers' & Merchants' Bank, prior to the time said bank was taken over by said Bank Commissioner, including the daily statement of resources and liabilities of said bank from February, 1908, to September 3, 1912, all remittance records for the years 1910, 1911, and 1912, journal of daily business in detail from 1910 to September 3, 1912, note register, and the individual ledger, showing the personal accounts of B. C. Burnett, the Big Pond Oil Company, Boggy Oil & Gas Company, the Brown Real Estate Company, the Creek County Investment Company, the Elbert Oil & Gas Company, and the Sapulpa Interurban

Railway Company, or show cause to the contrary on or before Monday, October 14, 1912, at 9 o'clock a. m.

"WADE S. STANFIELD, Judge."

The record further shows that on said day the sheriff of Creek county served said court order by delivering a true copy to Bates C. Burnett, as president, and Birch C. Burnett, as cashier, of the Farmers' & Merchants' Bank of Sapulpa.

October 12th there was filed a stipulation, signed by W. C. Reeves, Assistant Attorney General, for plaintiff, and Rutherford & Lawrence and Stuart, Cruce & Gilbert for the defendants, wherein it is stipulated and agreed that further hearing of said case shall be continued until a district judge is assigned to Creek county in place of Hon. Wade S. Stanfield, who is disqualified to sit in said cause. October 16th the Chief Justice assigned Hon. Tom D. McKeown, of the Seventh judicial district, to hold court at Sapulpa, in the Twenty-Second judicial district, on October 18th and 19th.

October 18th the Attorney General filed an information, duly verified by L. H. Patton, Assistant Bank Commissioner, which, omitting the formal parts, is as follows:

### "INFORMATION.

"Comes now Chas. West, Attorney General of the state of Oklahoma, and gives the court to know and be informed that in the course of certain interlocutory proceedings in this action an order was duly made by this court, requiring the officers, directors, and employees of the Farmers' & Merchants' Bank, one of the defendants in said cause, to turn over and deliver to the Bank Commissioner of the state of Oklahoma certain books pertaining to the business of said Farmers' & Merchants' Bank, or show cause to the contrary on or before October 14, 1912, at 9 o'clock a. m., which order was duly served on Bates B. Burnett, Birch C. Burnett, two of the officers of said Farmers' & Merchants' Bank, on the 11th day of October, 1912, and on Brooks G. Burnett, an employee of said bank, on the 12th day of October, 1912, a copy of which order is attached hereto, as a part hereof and marked 'Exhibit A'; that said Bates B. Burnett, Birch C. Burnett, and Brooks G. Burnett, and each of them, wholly failed and refused, and still fail and refuse, to obey said order, and refuse to deliver to said Bank Commissioner of the state of Oklahoma any of the books described in said order. Wherefore plaintiff

prays that said Bates B. Burnett, Birch C. Burnett, and Brooks G. Burnett be committed to the county jail of Creek county, Oklahoma, until they fully comply with said order, and that they be adjudged to pay the costs of this proceeding."

On said day the defendants, appearing specially, filed a motion to quash the writ issued on the information, because said writ was issued without authority of law, and because no sufficient showing had been made to authorize the issuance of the said writ. The motion was by the court overruled, and on the same day the defendants filed their special demurrer, on the ground "that there is a defect as to parties plaintiff in this, to wit: Because of the failure to make the Bank Commissioner of the state of Oklahoma a party plaintiff." The court sustained the demurrer, with permission to the plaintiff to amend by making the Bank Commissioner an additional party plaintiff.

December 31st the Chief Justice assigned the Honorable A. H. Huston, of the Eleventh judicial district, to hold court at Sapulpa, Creek county, for a period beginning January 14, and continuing up to and including January 18, 1913.

On January 14th, in open court, Hon. A. H. Huston, presiding judge, the defendants filed their answers, as follows:

"Answer to Rule.

"Now come the defendants, Bates B. Burnett and Birch C. Burnett, who on the 11th day of October, 1912, were cashier and president, respectively, of the defendant the Farmers' & Merchants' Bank, and without waiving any of the exceptions heretofore entered to the issuance of the order of the court heretofore made, or to the petition of the plaintiff heretofore filed in this case, but still insisting that said order directing these defendants to show cause was issued without any authority of law and was void, and still insisting that this court is without jurisdiction to compel them in this proceeding to answer said order of the court, and protest that the plaintiffs, if any right they have, have a plain, complete, and adequate remedy at law, they state that they are unable to comply with said order, and are unable to deliver to the plaintiff, the Bank Commissioner, the various books and records referred to in the order of the court heretofore made, to wit, the daily statement of resources and liabilities of said bank from February, 1908, to September 3, 1912, all remittance records for the years 1910, 1911, and 1912, journal of daily business in

Statement of Facts.

detail from 1910 to September 3, 1912, note register, and the individual ledger, showing the personal accounts by Birch C. Burnett, Bates B. Burnett, the Big Pond Oil Company, Boggy Oil & Gas Company, the Brown Real Estate Company, the Creek County Investment Company, the Elbert Oil & Gas Company, and the Sapulpa Interurban Railway Company, for the reasons that neither of these defendants now has, nor has he had since the said 9th day of September, 1912, nor for several days prior thereto, the possession, custody, or control of any of said records, nor has either one of these defendants any knowledge of the whereabouts of said records, or knowledge of any facts that would enable either of them to produce said records to the Bank Commissioner. Wherefore these defendants ask to be discharged and relieved from the obligations imposed upon them by virtue of the issuance of said order out of this court. Second. These defendants state that the discovery and the possession of the books sought herein are not sought in good faith, for the purpose of enabling the Bank Commissioner to liquidate the Farmers' & Merchants' Bank, but that said books are sought for the purpose of instituting criminal prosecutions against these defendants, charging them with violations of the criminal laws of the state of Oklahoma in connection with the affairs of said bank; that it is the purpose of the Attorney General of the state to institute criminal prosecutions against these defendants for various acts charged against them in connection with their duties as officers of said bank, and the plaintiff herein hopes and expects to get information from said books to assist in said prosecution; that even if it were in the power of these defendants to produce said books they might contain information which would tend to incriminate these defendants and to render them liable to criminal prosecution, and they here plead that this court has no authority or power to compel them to produce said books, even if it were in their power so to do. They state that they do not know personally of all the entries in said records, for the reason that said records were not made by them, but that they do not object to producing said books if it were in their power, provided said books do not contain matters tending to incriminate them. Wherefore these defendants ask to be discharged and relieved from the obligations imposed upon them by virtue of the issuance of said order out of this court.

"RUTHERFORD & LAWRENCE,
"STUART, CRUCE & GILBERT,
"Attorneys for Defendants.

"State of Oklahoma, Creek County—ss.:

"Bates B. Burnett and Birch C. Burnett, each being duly sworn according to law, states that he has read the above and foregoing answer and knows the contents thereof, and that the statements therein contained are true to the best of his knowledge and belief.

"BATES B. BURNETT.

"B. C. BURNETT.

"Subscribed and sworn to before me this the 14th day of January, 1913.

"R. HERMAN KILLEBREW,

"Notary Public. [Seal.]

"My commission expires Mar. 18, 1916."

Thereupon the plaintiff filed a reply as follows:

"REPLY.

"Comes now the plaintiff in the above-entitled cause, and for its reply to the answer filed herein by the defendants on the 14th day of January, 1913, alleges and states that the matters, things. and facts alleged in defendants' purported answer to the rule of court, requiring them to produce certain books herein, does not state facts sufficient in law to relieve said defendants from the operation and effect of said rule; that at the last examination by the state bank examiner had of the condition of the Farmers' & Merchants' Bank of Sapulpa, prior to September 9, 1912, the books referred to in the court's order were in the possession and under the control of said Farmers' & Merchants' Bank and its officers, and that the Bank Commissioner of the state of Oklahoma took charge of said bank on the 9th day of September, 1912, and on that date and at that time said books were not found in said bank, and at the time that said Bank Commissioner took charge of said bank on, to wit, the 9th day of September, 1912, said books, nor any of them, were in said bank, and said books, nor any of them, have ever come into the possession or under the custody and control of your petitioner, or of said Bank Commissioner; that, in order that the condition of said bank as relates to its assets and liabilities, may be understood and ascertained, your petitioner states that it is absolutely necessary for your petitioner to have the custody and control of said books.

"CHARLES WEST, Attorney General,

"W. C. REEVES.

"MCDOUGAL & LYTLE,

"Attorneys for Plaintiff.

"State of Oklahoma, County of Creek—ss.:

"Comes now L. H. Patton, who being first duly sworn, on his oath, deposes and says that he is Assistant Bank Commissioner for the state of Oklahoma; that he has heard read the above and foregoing reply on the part of the petitioner made, well acquainted with the facts therein contained, and that said facts are true.

"L. H. PATTON.

"Subscribed and sworn to before me this 14th day of January, 1913.

"RUTH SNYDER, Notary Public.   [Seal.]

"My commission expires October 9, 1916."

The defendants thereupon filed their verified application for a continuance, which was overruled, and the court proceeded to hear the evidence.

The following named witnesses testified on behalf of the state: The defendant Chas. W. Wills, R. Herman Killebrew, bookkeeper in said bank, the defendant S. C. Nigh, L. H. Patton, Assistant Bank Commissioner of the state, and M. R. Garnett, state bank examiner; also Brooks Burnett. When the state rested, the defendants called W. C. Reeves, Assistant Attorney General, as a witness. No other testimony was offered on behalf of the defendants.

The findings of the court, as shown by the record, are as follows:

"By the Court: In this case, as I recall this petition, it alleges the insolvency of the bank (I think it alleges that), and alleges the use of the funds of the bank in the financing of several corporations, and asks for a receiver for the bank and for the various corporations, and then asks for judgment against certain stockholders named; that is, to recover the double liability provided by statute. That, in substance, is the range of this petition as I get it, isn't it?

"By Mr. Reeves: I think so.

"By the Court: After that petition was filed, the presiding judge refused the application contained therein for the appointment of a receiver, either for the bank, or these other corporations.

"By Mr. Reeves: The order just relates to the application in regard to the bank.

"By the Court: And an opinion was expressed by the judge that he would deny that application for a receiver—whether he

passed on the question as to whether the plaintiff was entitled to the judgment or not, perhaps not—and said something or other in the opinion that it should be retained or proceeded with in the nature of a bill of discovery. It is not like the opinion of any other court. This is the same court, as it is the rule here a court may be composed of several judges, one acting at a time at different times; it is all the same court. I would not be disposed, after other judges had held the court for a time and made any rulings, to go back of those. Whether they are right or wrong may be determined by the Supreme Court, but not by me. Even if I had an opinion that they were, I should not reverse them, because I would assume that if there was any error in them the party injured could save his exceptions and test the case on them in the Supreme Court. Whether it is in the nature of a bill in equity or a bill of discovery or not, it has not been a ruling. Of course he suggested that in an opinion. I am not concerned much with what it is. I don't care what you call it. Here is a suit pending, and in this suit an order is made. Now, whether, in the opinion of one judge, the case itself is in the nature of a bill of discovery, or what it is, the fact that that might have been his opinion would not invalidate the order made, if he had a right to make it. Now, it is said that, pursuing it logically, which I think the counsel ingeniously did, that is a suit in equity, and that a suit in equity cannot be maintained as long as there is an adequate remedy at law; and the adequate remedy at law suggested is an action in replevin. I do not think that is an adequate remedy. What good would be a judgment of replevin for the recovery of the account books if the officers couldn't find them? And a judgment for the value of them, which has been suggested, would be practically nothing. They are of no value themselves, except to use as the Bank Commissioner requires; they wouldn't have any value as articles of commerce. They might be of inestimable value to the Bank Commissioner to enable him to settle up the affairs of the bank; but, so far as being able to do anything with them, to dispose of them, nothing could be done at all, so a judgment for their value would be no adequate remedy.

"Perhaps a more serious point is that urged that a demurrer to the petition—the first pleading filed was this petition. On that petition this order was made. Later a demurrer to the petition was filed, and one of the judges sustained that demurrer; and it was therefore argued, logically too, that with the sustaining of that demurrer the petition itself fell, and when it went down everything else went with it. It might not have been necessary

to have demurred to procure all that was procured in this case. An application to have another party made or joined would have had the same effect. No demurrer was sustained because of the insufficiency of the petition upon its merits; it didn't fall in that way; it still stands, so far as the allegations therein are concerned, but another party was joined as a party plaintiff. Technically, taking the argument on the technicalities, the argument that has been made is reasonable. Can the court regard that? It has been said by some of the old English judges that when the technicalities of the law tend to justice, then the court should make much of it; and when they do not the court should not make very much of them. The bare fact that another party was asked to be joined, and he was joined, would not, in fact and in effect, interfere with the order of the judge made, ordering the production of these books. Now a special arm of the state government is brought in, and, because the court held it was necessary to bring him in, to hold that invalidated the order theretofore made, requiring the parties to produce these books, it seems to me, would be sacrificing the real for the shadow of things.

"The only thing left is the evidence produced upon this hearing. As a reason for not producing them, they file an answer, saying they haven't got them. Of course, that is a pretty good reason, perhaps, if they can't; but can the court act upon the bare statement of that kind, connected with the statement that they ought not to be required to produce them anyway, because it might incriminate them? The testimony is that these books were there in the bank; that they were officers of the bank; they exercised full control, under this evidence. The witness Wills, acting as assistant cashier, and Mr. Nigh were directors somewhat to their doubt. They didn't seem to know whether they were directors or not. Evidently they didn't have anything to do with the control. Even Brooks Burnett didn't know that he was a director. That is the five. The president and cashier ran this bank, and it is the testimony of Brooks Burnett that he merely went there with the keys and handed them over to the bank examiner on the direction of either Bates or Birch. He was acting then for those who were actually in charge, for those who were running, operating and controlling that bank. I don't know anything about this, except what I have heard in the evidence. I didn't know what case I was coming over to try, so I could not be influenced by anything else. From this evidence I am convinced that these two gentlemen are the ones that were in full control of this bank. Being in full control of the bank, they were in control of its records, books, and papers. If they were not there

when the bank examiner took charge, and unless there was some burglary, which isn't attempted to be alleged, why they must know where they are. They may have put them beyond their reach temporarily; they possibly may have destroyed them. There is nothing alleged though; there is nothing said. If they are destroyed so as to relieve them from producing them, they must show it. Perhaps the weakest part in the plaintiff's proposition is that the order itself runs to the bank officers, naming nobody. I think the individuals should have been named; but these individuals were served personally, and the evidence is they were bank officers, the president and cashier. These two are the highest bank officers, and they were the persons that were served. That was away back in October some time. Now, from that time to this they have had notice; it was their place to produce these books. They don't say they are destroyed; they say they haven't them in their control. They say nothing in their answer as to how they got away from their possession. If there was some sort of a reasonable explanation from the time they had them, that at some time the bank was robbed, or that some one else was in the bank, who had possession of these books, and went away, something to reasonably show to the court that these books got away from them without their connivance and without their consent, the court might consider it. Under this evidence the court can only find that they themselves knew what became of them. It still might be true, if they got rid of them, that they wouldn't know where they are now. They might have given them to somebody else, or somebody else removed them elsewhere; they might still swear they don't know where they were, and they were not under their control. The court must believe they can get them under their control again. The arm of the law ought not to be so weak that it can't deal with situations of this kind.

"The state has a system of bank examinations by a Bank Commissioner. whose duty it is to come and take charge of banks in failing circumstances and wind up their affairs. Is it possible to defeat and delay the banking officers by taking the books out of the banking house that are necessary to do that, and then come up to the court and say: 'You can't do that; the court is not strong enough to handle me. Proceed in some more orderly, lengthy way.' I don't think that is the intention of the law at all.

"Come forward, Mr. Bates B. Burnett and Birch C. Burnett. You have been heretofore directed by this court to produce certain described books and papers of the Farmers' & Merchants' Bank of Sapulpa, or show cause why you did not produce them. You have filed an answer. You failed to produce them, but you

filed an answer, saying you did not know where they were. Your answer has been held to be insufficient by the court. Have either of you anything further to say why you should not be punished for contempt of court in failing to obey the order, Mr. Bates B. Burnett?

"By Mr. Bates B. Burnett: No, sir.

"By the Court: Mr. Birch C. Burnett?

"By Mr. Birch C. Burnett: No, sir.

"By the Court It is the judgment of the court that you have failed to obey the order of the court in not producing the books of the bank described in the order, and that you have failed to show sufficient cause why you have not done so; and it is the judgment of the court that you be imprisoned in the county jail of this county until such time as you shall produce these books and papers. I shall not grant a supersedeas of the order, but will stay the order for the period of ten days upon the giving of the bond of $3,000 each, and will stay the order after the giving of the bond for the period of ten days, to enable you to lodge your petitions in error, or any proceeding you want, and there ask for the stay. I don't think in this character of a case the trial court should grant a supersedeas. I have had several of that kind of cases, and I want the Supreme Court to have a chance to grant the supersedeas themselves. The defendants will be placed in custody of the sheriff until these bonds are given."

The judgment and sentence was rendered and entered January 15, 1913, and contains the following recital:

"It is therefore ordered, and adjudged that said defendants, Bates B. Burnett and Birch C. Burnett, be confined and imprisoned in the county jail of Creek county, Oklahoma, until they shall deliver and turn over, or cause to be delivered and turned over, to the Bank Commissioner of the state of Oklahoma the following books and property of the Farmers' & Merchants' Bank, now in process of liquidation by said Bank Commissioner, to wit, daily statement of resources and liabilities of said bank from February, 1908, to September 3, 1912, all remittance records for the year 1910, 1911, and 1912, journal of daily business in detail from 1910 to September 3, 1912, note register, and the individual ledger, showing the personal account of B. C. Burnett, B. B. Burnett, the Big Pond Oil Company, Boggy Oil & Gas Company, the Brown Real Estate Company, the Creek County Investment Company, the Elbert Oil & Gas Company, and the Sapulpa Interurban Railway Company, to which judgment defendants and each of them except. It is further ordered and adjudged that said defendants, Bates B. Burnett and Birch C. Bur-

nett, be held in the custody of the sheriff of said county of Creek until they each give bond in the sum of three thousand ($3,000) dollars, with good and sufficient sureties, said bond to be approved by the clerk of the district court, conditioned that they file their petition in error in the proper appellate court of this state and obtain therein an order of supersedeas within ten (10) days from this date; and upon the giving and approval of such bond, then execution herein be stayed for a period of ten (10) days from this date; and should said defendants fail to obtain a supersedeas in said appellate court within said period of ten (10) days, then said sheriff of Creek county will proceed to carry out the judgment and commitment of this court—to all of which orders, ruling, and judgments defendants and each of them at the time duly excepted."

An appeal to this court was duly perfected by filing, January 25th, a petition in error with case-made, at which time an application for supersedeas was allowed and an order made, fixing $5,000 as the amount of the bond for each defendant; also an order that the cause be advanced and set for argument and final submission on February 7th, at which time it was argued and submitted.

*J. B. Rutherford, J. F. Lawrence,* and *Stuart, Cruce & Gilbert,* for plaintiffs in error.

*Chas. West,* Atty. Gen., and *W. C. Reeves,* Asst. Atty. Gen., for the State.

DOYLE, J. (after stating the facts as above). The statement of facts has been made somewhat full in order that, by exhibiting the various proceedings in detail, the errors assigned and relied upon for a reversal of the judgment may be at once clearly understood and deprived of any seeming force.

We are confronted at the threshhold of the cause with the contention of the Attorney General "that this is a civil proceeding, and that this court has no jurisdiction to review the judgment of the lower court," citing the case of *Flathers v. State,* 7 Okla. Cr. 668, 125 Pac. 902, and cases therein cited. While the Attorney General may have proceeded upon the theory that the proceeding was remedial and the contempt civil, it is evident from the record that the district court very properly considered the defendants' contumacy a "direct" or "public," and therefore, a criminal

contempt; and, though the proceedings were had to compel a compliance by the defendants with an order of the court, the punishment was primarily in the interest of public justice to vindicate the authority and the dignity of the court from the disrespect shown to it and to its order by the defendants.

We think this case is clearly distinguished from the Flathers case, wherein this court held that a refusal and neglect to pay alimony constituted a civil contempt. In the opinion in that case the following language is used:

"Contempts of court are of two kinds, civil and criminal. Much confusion exists in judicial decisions as to whether or not contempt proceedings are civil or criminal. As a general rule, these designations must be considered with reference to the specific question before the court. * * * In the absence of a statutory classification, it is impracticable to state a general rule by which, in all cases, to distinguish these two classes, in the one or the other of which every act of contempt must be classified."

When the State Bank Commissioner, in the name of the state of Oklahoma, through its Attorney General, asked that the books and records of the Farmers' & Merchants' Bank of Sapulpa be produced, it was for the purpose of protecting the interest of the state and the rights of the public, not the interest of an individual litigant. One of the provisions of the Bank Guaranty Law (section 324, Comp. Laws 1909) is that:

"The Bank Commissioner shall take possession of the books, records and assets of every description of such bank or trust company, collect debts due, and claims belonging to it, and upon order of the district court, or judge thereof, may sell or compound all bad or doubtful debts, and on like order may sell all the real or personal property of such bank or trust company upon such terms as the court or judge thereof may direct, and may, if necessary, pay the debts of such bank or trust company, and enforce the liabilities of the stockholders, officers and directors; provided, however, that bad or doubtful debts as used in this section shall not include the liability of stockholders, officers and directors."

The power to punish contempts is inherent in all courts of justice, and is expressly conferred upon them by the Constitution. Article 2, sec. 25, Bill of Rights. Its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders and decrees of the court, and con-

sequently to the due administration of justice; and upon its proper and prudent exercise depend the respect and dignity and efficiency of our courts of justice. It has been well said that:

"The exercise of this power has a twofold aspect, namely: First, the proper punishment of the guilty party for his disrespect to the court or its orders; and, second, to compel his performance of some act or duty required of him by the court, which he refuses to perform." (*Texas v. White,* 22 Wall. 137, 22 L. Ed. 819.)

A party to a suit, who willfully destroys, removes, conceals, or disposes of its subject-matter pending the proceedings, with intent to withdraw it from the jurisdiction of the court, and to render futile any order or decree concerning it, unavoidably defies the power and offends the dignity of the court, and thereby renders himself liable to punishment for contempt. Cyc. par. E, and cases cited, p. 8, note 22.

As to the distinction between civil and criminal contempts, Mr. Rapalje, in his work on Contempts, at section 21, gives the best general definitions relating thereto we have found. He says:

" 'Civil contempts' are those quasi contempts which consist in failing to do something which the contemner is ordered by the court to do for the benefit or advantage of another party to the proceeding before the court; while 'criminal contempts' are all those acts in disrespect of the court or its process, or which obstruct the administration of justice, or tend to bring the court into disrepute."

In the case of *Gompers v. Bucks Stove & Range Co.,* 221 U. S. 418, 31 Sup. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874, it is said:

"The distinction between civil and criminal contempts seems to be that, where the order of the court is made in a civil proceeding solely for the benefit of one of the parties litigant, and is disobeyed by the other party to the suit, an order committing such party for contempt until he yields obedience to the order is a civil proceeding. Such are orders requiring the payment of money or the performing of some act for the benefit of the opposing litigant, and are not matters in which the public is interested. Criminal contempts consist in such disobedience of the mandates or decrees of a court as constitute a defiance of the power and authority of the court."

In *Bessette v. Conkey Co.*, 194 U. S. 329, 24 Sup. Ct. 667, 48 L. Ed. 997, Mr. Justice Brewer said:

"It may not be always easy to classify a particular act as belonging to either one of these two classes. It may partake of the characteristics of both. A significant and generally determinative feature is that the act is by one party to a suit in disobedience of a special order made in behalf of the other. Yet sometimes the disobedience may be of such a character and in such a manner as to indicate a contempt of the court, rather than a disregard of the rights of the adverse party."

See, also, *Clay v. Waters*, 178 Fed. 385, 101 C. C. A. 645, 21 Ann. Cas. 897, and cases collated in the note; also *Smythe v. Smythe*, 28 Okla. 266, 114 Pac. 257.

The contumacious conduct and acts of these defendants, as officers of said bank, in refusing to produce the books, records, and papers of said bank were well calculated to embarrass and obstruct the court in the due administration of justice, and constitute a contempt of flagrant character in the face of the court. We think this was the view of the trial court, because the court, before pronouncing judgment, said to the defendants: "Your answer has been held to be insufficient by the court. Have either of you anything further to say why you should not be punished for contempt of court in failing to obey its orders?"

It is our opinion that the proceedings and judgment committing the defendants to confinement in the county jail were criminal, and therefore reviewable on appeal by this court. The motion to dismiss the appeal is therefore denied.

The first contention of the learned counsel for the defendants is that no sufficient predicate was laid in the petition for the order to produce the books; and it is argued that the order was void, because it commanded the officers of said bank to produce the books, without naming any particular person, and that, inasmuch as the main body of the suit fell when the application for a receiver was denied, all other orders fell with it. There is no merit in this contention. It is enough that the district court had jurisdiction of the parties and subject-matter of the action, and was exercising its jurisdiction to hear and determine the issues in the case. If the court having jurisdiction should issue an im-

proper order, it is obligatory until reversed by an appellate court; and parties may be punished for disobedience or resistance of such orders. Rapalje on Contempt, sec. 16. Thus, where the alieged contempt consists in the failure to comply with the terms of a court order or decree, inquiry into the merits of the order or decree will not be allowed. 9 Cyc. p. 47, and cases cited in note 58.

It is next contended that the defendants' answer was sufficient to purge them of contempt, as it shows inability to comply with the order of the court; and for this reason they were entitled to their discharge, and the infliction of punishment by the court was the exercise of arbitrary and unconstitutional power. The doctrine of the common law that in constructive criminal contempts, alleged to have been committed out of the presence of the court, if the defendant's sworn answer squarely met and denied the alleged contempt, such answer was conclusive, and no further evidence could be received, has no application in this case. Here the defendants' answer states as a mere conclusion their inability to comply with the order of the court. The testimony of the other officers of the bank shows that these defendants were in possession of the bank's books and records, and no explanation is made or offered by them as to how or in what manner these books and records passed from their control. However, as hereinbefore stated, this was a direct contempt in the face of the court, and the hearing was given to conform with the constitutional guaranty of section 25 of the Bill of Rights, which provides: "In no case shall a penalty or punishment be imposed for contempt until an opportunity to be heard is given." Inability to comply with an order of the court may, under certain circumstances, avail as a defense for failure to obey the same; but it stands as an inflexible rule of common sense and common justice that, where the contemnor creates the inability to comply, in anticipation of an order of court, commanding him to produce and deliver, he rather aggravates than extenuates his offense. The defendants cannot avoid obedience to the order of the court by simply adding perjury to fraudulent concealment or misappropriation of the books, records, and papers of the bank of which

they were officers. We think the true rule in proceedings for contempt for disobedience of an order of court is that the sworn answer of the party charged with contempt is evidence to purge him thereof; but it is not conclusive evidence. It may be contradicted and supported by other evidence; and the question whether or not the party charged has purged himself of the contempt is for the determination of the court, upon the consideration of all the evidence adduced for and against him; and if, upon the hearing so had, the court is satisfied that it is within the power of the party charged with contempt to comply with the order of the court, the court should enforce the order by a fine or confinement as for contempt. *Wartman v. Wartman,* Taney, 362, Fed. Cas. No. 17,210; *Clay v. Waters, supra; Ex parte Kellogg,* 64 Cal. 343, 30 Pac. 1030.

The only legal justification sought to be established by the defendants is the claim of privilege against self-crimination, in the second paragraph of their answer, as follows:

. "That even if it were in the power of these defendants to produce said books, they might contain information which would tend to incriminate these defendants, and to render them liable to criminal prosecution."

There is no merit in this contention. It ignores the fact that the order calls for the books, records, and papers of said Farmers' & Merchants' Bank, and commanding that the defendants, as officers of said state bank, produce the same. They are not asked to produce their private books and papers.

One of the best-considered cases on the question here presented is *Wilson v. U. S.,* 221 U. S. 361, 31 Sup. Ct. 538, 55 L. Ed. 771, Ann. Cas. 1912D, 558. The opinion by Mr. Justice Hughes is clear and logical, and shows great research, and it is here quoted:

"We come, then, to the broader contention of the appellant, thus stated in the argument of his counsel: 'An officer of a corporation, who actually holds the physical possession, custody, and control of books or papers of the corporation, which he is required by a *subpoena duces tecum* to produce, is entitled to the same protection against exposing the contents thereof which would tend to incriminate him as if the books and papers were absolutely his own.' That is, the power of the courts to require

their production depends, not upon their character as corporate books, and the duty of the corporation to submit them to examination, but upon the particular custody in which they may be found. If they are in the actual custody of an officer whose criminal conduct they would disclose, then, as this argument would have it, his possession must be deemed inviolable; and, maintaining the absolute control which alone will insure protection from their being used against him in a criminal proceeding, he may defy the authority of the corporation whose officer or fiduciary he is and assert against the visitatorial power of the state, and the authority of the government in enforcing its laws, an impassable barrier.

"But the physical custody of incriminatng documents does not, of itself, protect the custodian against their compulsory production. The question still remains with respect to the nature of the documents and the capacity in which they are held. It may yet appear that they are of a character which subjects them to the scrutiny demanded, and that the custodian has voluntarily assumed a duty which overrides his claim of privilege. This was clearly implied in the Boyd case, where the fact that the papers involved were the private papers of the claimant was constantly emphasized. Thus, in the case of public records and official documents, made or kept in the administration of public office, the fact of actual possession or of lawful custody would not justify the officer in resisting inspection, even though the record was made by himself, and would supply the evidence of his criminal dereliction. If he has embezzled the public moneys and falsified the public accounts, he cannot seal his official records and withhold them from the prosecuting authorities on a plea of constitutional privilege against self-crimination. The principle applies, not only to public documents in public offices, but also to records required by law to be kept, in order that there may be suitable information of transactions which are the appropriate subjects of governmental regulation and the enforcement of restrictions validly established. There the privilege, which exists as to private papers, cannot be maintained.

"There are abundant illustrations in the decisions. Thus, in *Bradshaw v. Murphy,* 7 C. & P. 612, 32 E. C. L. 654, it was held that a vestry clerk, who was called as a witness, could not, on the ground that it might incriminate himself, object to the production of the vestry books kept under the statute. 58 George III, c. 69, par. 2. In *State v. Farnum,* 73 S. C. 165, 53 S. E. 83, it appeared that a legislative committee had been appointed to investigate the affairs of the state dispensary; and it was pro-

vided that it should have access to all books of the institution, or of any officer or employee thereof. In anticipation the state dispenser removed certain books from the files, defending his action on the plea that they contained private matter which the committee had no right to inspect. The court ruled that it was the 'obvious duty of any officer to keep books, letters, and other documents relating to the business of his office, and to the manner in which he has discharged, or failed to discharge, its duties, in the place where the public business with which he is charged is conducted, subject to examination by any of the committees appointed by the General Assembly; and upon an application for mandamus to compel him to perform this obvious public duty, it is essential for the court to ascertain the facts and inform itself whether there has been an actual removal of public documents or other public property and a refusal to return them for examination.' In *State v. Donovan,* 10 N. D. 203, 86 N. W. 709, the defendant was a druggist, who was required by statute to keep a record of all sales of intoxicating liquors made by him, which should be subject to public inspection at reasonable times. It was held that the privilege against self-incrimination was not available to him with respect to the books kept under the law; for they were 'public documents, which the defendant was required to keep, not for his private uses, but for the benefit of the public, and for public inspection.' On similar grounds, in *State v. Davis,* 108 Mo. 666, 18 S. W. 894, 32 Am. St. Rep. 640. the court sustained a statute requiring druggists to preserve the prescriptions they compounded, and to produce them in court when required. See, also, *State v. Davis,* 68 W. Va. 142, 69 S. E. 639, 32 L. R. A. (N. S.) 501, Ann. Cas. 1912A, 996; *People v. Coombs,* 158 N. Y. 532, 53 N. E. 527; *Louisville, etc., R. Co. v. Commonwealth,* (Ky.) 51 S. W. 167; *State v. Smith,* 74 Iowa, 580, 38 N. W. 492; *State v. Cummins,* 76 Iowa, 133, 40 N. W. 124; *People v. Henwood,* 123 Mich. 317, 82 N. W. 70; *Langdon v. People,* 133 Ill. 382, 24 N. E. 874.

"The fundamental ground of decision in this class of cases is that, where, by virtue of their character and the rules of law applicable to them, the books and papers are held subject to examination by the demanding authority, the custodian has no privilege to refuse production, although their contents tend to criminate him. In assuming their custody, he has accepted the incident obligation to permit inspection.

"What, then, is the status of the books and papers of a corporation which has not been created as a mere instrumentality of government, but has been formed pursuant to voluntary agree-

ment, and hence is called a private corporation? They are not public records in the sense that they relate to public transactions, or in the absence of particular requirements, are open to general inspection, or must be kept or filed in a special manner. They have reference to business transacted for the benefit of the group of individuals whose association has the advantage of corporate organization. But the corporate form of business activity, with its chartered privileges, raises a distinction when the authority of government demands the examination of books. The demands, expressed in lawful process, confining its requirements within the limits which reason imposes in the circumstances of the case, the corporation has no privilege to refuse. It cannot resist production upon the ground of self-incrimination. Although the object of the inquiry may be to detect the abuses it has committed, to discover its violations of law, and to inflict punishment by forfeiture of franchises or otherwise, it must submit its books and papers to duly constituted authority, when demand is suitably made. This is involved in the reservation of the visitorial power of the state and in the authority of the national government, where corporate activities are in the domain subject to the powers of Congress.

"This view, and the reasons which support it, have so recently been stated by this court in the case of *Hale v. Henkel, supra* ·[201 U. S. 43, 26 Sup. Ct. 370, 50 L. Ed. 652], that it is unnecessary to do more than to refer to what was there said (201 U. S. at pages 74, 75, 26 Sup. Ct. at page 379 [50 L. Ed. 652]) : 'Conceding that the witness was an officer of the corporation under investigation, and that he was entitled to assert the rights of the corporation with respect to the production of its books and papers, we are of the opinion that there is a clear distinction in this particular between an individual and a corporation, and that the latter has no right to refuse to submit its books and papers for an examination at the suit of the state. The individual may stand upon his constitutional rights as a citizen. He is entitled to carry on his private business in his own way. His power to contract is unlimited. He owes no duty to the state or to his neighbors to divulge his business, or to open his doors to an investigation, so far as it may tend to criminate him. He owes no such duty to the state, since he receives nothing therefrom, beyond the protection of his life and property. His rights are such as existed by the law of the land long antecedent to the organization of the state, and can only be taken from him by due process of law, and in accordance with the Constitution. Among his rights are a refusal to incriminate himself, and the immunity of himself

and his property from arrest and seizure, except under a warrant of the law. He owes nothing to the public, so long as he does not trespass upon their rights. Upon the other hand, the corporation is a creature of the state. It is presumed to be incorporated for the benefit of the public. It receives certain special privileges and franchises, and holds them subject to the laws of the state and the limitations of its charter. Its powers are limited by law. It can make no contract not authorized by its charter. Its rights to act as a corporation are only preserved to it so long as it obeys the laws of its creation. There is a reserved right in the Legislature to investigate its contracts and find out whether it has exceeded its powers. It would be a strange anomaly to hold that a state, having chartered a corporation to make use of certain franchises, could not, in the exercise of its sovereignty, inquire how these franchises had been employed, and whether they had been abused, and demand the production of the corporate books and papers for that purpose. The defense amounts to this: That an officer of a corporation, which is charged with a criminal violation of the statute, may plead the criminality of such corporation as a refusal to produce its books. To state this proposition is to answer it. While an individual may lawfully refuse to answer incriminating questions, unless protected by an immunity statute, it does not follow that a corporation, vested with special privileges and franchises, may refuse to show its hand when charged with an abuse of such privilege. * * * Being subject to this dual sovereignty, the general government possesses the same right to see that its own laws are respected as the state would have with respect to the special franchises vested in it by the laws of the state. The powers of the general government in this particular, in the vindication of its own laws, are the same as if the corporation had been created by an act of Congress. It is not intended to intimate, however, that it has a general visitatorial power over state corporations.' See, also, *Consolidating Rendering Co. v. Vermont*, 207 U. S. 541, 28 Sup. Ct. 178, 52 L. Ed. 327, 12 Ann. Cas. 658; *Hammond Packing Co. v. Arkansas*, 212 U. S. 322, 348, 349, 29 Sup. Ct. 370, 53 L. Ed. 530, 15 Ann. Cas. 645.

"The appellant held the corporate books subject to the corporate duty. If the corporation were guilty of misconduct, he could not withhold its books to save it; and if he were implicated in the violations of law, he could not withhold the books to protect himself from the effects of their disclosures. The reserved power of visitation would seriously be embarrassed, if not wholly defeated in its effective exercise, if guilty officers could refuse inspection of the records and papers of the corporation. No

personal privilege to which they are entitled requires such a conclusion. It would not be a recognition, but an unjustifiable extension, of the personal rights they enjoy. They may decline to utter upon the witness stand a single self-criminating word. They may demand that any accusation against them individually be established without the aid of their oral testimony or the compulsory production by them of their private papers. But the visitatorial power which exists with respect to the corporation, of necessity, reaches the corporate books without regard to the conduct of the custodian."

All of the records and papers of the Farmers' & Merchants' Bank of Sapulpa are public records, and became, when it was taken over by the Bank Commissioner, the property of the state.

In the case of *Noble State Bank v. Haskell,* 22 Okla. 88, 97 Pac. 607, it is said:

"Banks are chartered by the state, not with the paramount view of enabling the stockholders to make investments and derive profits therefrom, but to meet a public necessity. The stockholders, having made investments therein, should be protected; but private interest must always be subordinated by the state, in the reasonable exercise of its police power, to the public welfare or good. With the view that the depositor, as well as the stockholder, and the general public with an incidental interest therein, may be protected, banking is regulated, and limitations, restraints, and requirements are imposed. The imposition of double liabiltiy upon the stockholders, the requirement of reserve funds, stipulations as to what capital stock cannot be invested in, prescribed qualifications of the directors—all these having been tried, in the judgment of the Legislature the further restriction that active officers should not borrow from the bank without incurring pains and penalties was deemed salutary. In addition, to further and more completely protect the depositors, the depositors' guaranty fund is created; the Legislature acting pursuant to the mandatory declaration of the Constitution. Section 1, art. 14."

And in the case of *State ex rel. v. Cockrell,* 27 Okla. 630, 112 Pac. 1000, it is said:

"That the depositors' guaranty fund, and the funds of a failed bank in the hands of a Bank Commissioner for the purpose of reimbursing the depositors' guaranty fund, is as much a fund of the state as the common school fund is also true. The depositors' guaranty fund act was sustained by this court on the theory of the reserved power of the state to alter and amend charters of state banking corporations for the public welfare. [Citing cases.]

This power, exercised for the public welfare by the legislative act which causes to be levied the assessment 'against the capital stock of each and every bank or trust company organized or existing under the laws of this state   *   *   *   equal to five per centum of its average daily deposits during its continuance in business as a banking corporation,' for the purpose of protecting the depositors of such banks (section 3, art. 2, c. 5, pp. 121-123, Sess. Laws 1909), is the same as that which levies, or causes to be levied, a tax upon the people and property within the state for the maintenance. and support of the common schools and educational institutions. The title of such depositors' guaranty fund vests in the state just as much so as the common school lands, or the proceeds of the sale of the same, and the taxes levied and collected for the maintenance and support of said schools, all of which are held in trust by the state for a specific purpose. Even if it were not a state fund, it would at least be a fund under the management of the state."

The officers of an insolvent state bank cannot disobey, on the ground of the constitutional protection against self-crimination, the order to produce and deliver the books, records, and papers of such bank to the State Bank Commissioner. The privilege against self-crimination afforded by section 21 of the Bill of Rights, " that no person shall be compelled to give evidence which will tend to incriminate him, except as in this Constitution specifically provided," does not protect the officers of an insolvent state bank in resisting the compulsory production of its books, records, and papers because such documents may tend to incriminate them. And such officers may be compelled, in a judicial proceeding, to produce the books, records, and papers of such bank for inspection, even though to do so would tend to incriminate them.

In conclusion we will say that these delinquent defendants must realize that the law is not so lame, helpless, and impotent that craft, intrigue, and subterfuge, or bold defiance, can defeat the due adminstration of justice. It is truly said that "courts might as well break and cast away their scepter of justice if derelicts may thus trifle with their authority." The public have a profound interest in preserving the power and authority of their courts of justice. Everything that affects the well-being of organized society, the life and liberty of the citizen, and the rights

of property is submitted to their decision. Without the power to punish for contempt, the courts would become objects of public derision, and the citizen would be without protection or security in his person and property.

The judgment is affirmed, and the order heretofore allowing bail as supersedeas is hereby revoked.

The clerk of the district court of Creek county is directed to issue to the sheriff of said county, commitments in accordance with the judgment of the court. Mandate to issue forthwith.

ARMSTRONG, P. J., and FURMAN, J., concur.